**STATE of Tennessee, Appellee,**

v.

**William Brian BELSER, Appellant.**

Court of Criminal Appeals of Tennessee,
at Knoxville.

Sept. 18, 1996.

No Permission to Appeal Applied
for to the Supreme Court.

Leroy Phillips, Jr. Phillips & Caputo, Leonard Michael Caputo Phillips & Caputo, Chattanooga, for Appellant.

Charles W. Burson Attorney General and Reporter, Nashville, Amy L. Tarkington, Assistant Attorney General, Criminal Justice Division, Nashville, Michael G. Nassios and Robert L. Jolley, Assistant District Attorneys, Knoxville, for Appellee.

## OPINION

WADE, Judge.

The defendant, William Brian Belser, was convicted of second degree murder and sentenced to a Range I, twenty-five (25) year term in the Department of Correction. *See* Tenn.Code Ann. §§ 39–13–210 and 40–35–112(a)(1). In this appeal of right, the defendant presents the following issues for our review:

(1) whether the trial court erred by charging self-defense as defined in Tenn.Code Ann. § 39–11–611(b) as a justification for the victim's conduct;

(2) whether the state committed prosecutorial misconduct during the course of the trial;

(3) whether the trial court erred by refusing to permit counsel for the defendant to cross-examine a state witness as to any possible bias;

(4) whether the trial court erred by refusing to allow defense counsel to question witness Angie Barbeau on redirect about her prior statements to law enforcement officers;

(5) whether the trial court erred by refusing to allow the defendant to introduce as evidence the full content of each of his pretrial statements after the state had completed its cross-examination;

(6) whether the trial court erred by failing to charge the jury on the lesser included offense of voluntary manslaughter; and

(7) whether the trial court erred by imposing the maximum sentence.

Because we find that the trial court committed reversible error by failing to instruct the jury on the lesser included offense of voluntary manslaughter, we must reverse the judgment of the trial court and remand the cause for a new trial.

### Facts

At approximately 10 P.M. on March 29, 1993, the defendant shot and killed the victim, Brian Shaver. Although the defendant and victim had previously been friends, tension had developed between the two men over their shared interest in Angela Barbeau. The defendant had dated Ms. Barbeau; several months prior to the shooting, however, she had moved into a residence with the victim. One week before the shooting, Ms. Barbeau broke off her relationship with the victim and returned to the defendant.

On the day of the shooting, the victim informed Ms. Barbeau that she could not come into his condominium and that he was placing all of her personal belongings outside the door. That evening, the defendant drove Ms. Barbeau to the victim's residence. Ms. Barbeau walked to the front porch and rang the door bell; upon answering, the victim shoved her to the ground and shut the door. Ms. Barbeau rang the doorbell a second time. By then, she had been joined by the defendant, who had a gun in his possession. The victim first opened and then slammed the door shut; he then opened the door again, stepped outside, and closed the condominium door behind him. Seconds later, the gun fired. Although Ms. Barbeau was present, she claimed that she did not see the actual shooting. Seriously wounded, the victim was able to return to the inside of his condo but died minutes later. The defendant claimed self-defense. Although they did not see the shooting, several witnesses saw the defendant carrying a gun as he stood just outside the victim's residence.

### STATE'S PROOF

Chadwick Bill Ferrell, a roommate of the victim, testified that he and several other young men were socializing at the condo at the time of the shooting. Ferrell related that the victim had talked with Ms. Barbeau by telephone several times throughout the day; the victim, obviously angry, threw her personal belongings on to the front lawn,

scattering many of the items. Ferrell later saw the defendant and Ms. Barbeau at the front door of the condominium. He described the defendant as "very focused" on the victim and noticed the laser sight on the defendant's gun flash inside the residence. Jeffrey Chandler Jackson and Kevin Hall corroborated various parts of Ferrell's testimony.

Robert John Bowlby testified that he had seen the defendant about a week and a half to two weeks earlier; the defendant was armed with the same gun which was later used to shoot the victim. When Bowlby asked the defendant what he intended to do with the weapon, the defendant replied, "I'm going to use this for any[one] that f—— with me, and that includes that Brian Shaver...."

Guy Adams testified that after the shooting, the defendant and Ms. Barbeau went to the residence of Jeff and Lisa Hubbard. Adams, who lived with the Hubbards, stated that the defendant claimed that the victim had initiated the fray by pulling Ms. Barbeau from the vehicle and striking her. The defendant told Adams that he took his weapon from the car trunk to get the victim to stop hitting Ms. Barbeau and fired only when he was charged by the victim. Adams also noted, however, that Ms. Barbeau showed no visible signs of having been involved in a struggle. Adams, who had several prior convictions of his own and an outstanding Community Corrections revocation notice, testified that the defendant asked him to "get rid of" the gun and that he cooperated by taking it to a friend's house. When arrested later, Adams helped police locate the weapon. Adams acknowledged that he had been allowed to stay on the Community Corrections program in exchange for his testimony in this case.

Lisa Michelle Hubbard, Adams' sister-in-law, testified that the defendant appeared to be "excited" after the shooting and that he called both the police and his father. Ms. Hubbard related that the defendant tried to clean the weapon and asked her and her husband to tell the police that he had thrown the gun away at a place other than where Adams agreed to take it. She stated that the defendant had admitted carrying the gun in his lap on the drive to the victim's condominium but had nevertheless asked the Hubbards to tell the police the gun was in the trunk of the car. Ms. Hubbard conceded that she had originally told the story the defendant had asked her to tell; she claimed that she had later recanted her fabrication and had testified truthfully at the trial.

Detective Dan Stewart examined the crime scene and supervised the collection of evidence. He testified that he took statements from several witnesses, including those of the defendant and Ms. Barbeau. He acknowledged that Ms. Barbeau showed no visible signs of injury.

Dr. David Douglas Wilson, who performed an autopsy on the victim, testified that a single bullet wound had caused death. He found that the bullet had traveled on a downward path through the victim's body. Don Carman of the Tennessee Bureau of Investigation Crime Laboratory estimated the distance between the muzzle of the gun and the victim to be "greater than 18 inches and less than 84 inches." His best estimate was that the distance between the two men was from "two to four feet."

### DEFENDANT'S PROOF

Larry Fletcher, a firearms examiner, held the opinion that the distance between the muzzle of the gun and the shirt was from "1 to 2 feet." James Russell Davis, another forensic scientist, stated that his testing did not eliminate the possibility that the victim handled or fired the gun.

Angela Christine Barbeau, who had lived with the victim for months was in the process of moving on the day of the shooting, testified that she was outside the condo at the time the shot was fired. Ms. Barbeau, employed at a strip club at the time, claimed that she was at her mother's house at 8:30 P.M. when she received an angry phone call from the victim. She described the victim as "ranting and raving ... yelling and screaming" and claimed that he ordered her to come to his residence to collect her belongings. Ms. Barbeau testified that the defendant accompanied her in order to help determine whether her clothing had been thrown into

the front yard. She explained that she went to the condo only because she thought the victim was not at home and that she could collect her belongings there without a confrontation.

Ms. Barbeau claimed that the victim approached her from behind, pulled her out of the car, and knocked her down several times. She stated that when the victim left, she followed him to his condo and knocked on the door. She contended that the victim opened the door, shoved her to the ground, and "backhanded" her before the defendant intervened by warning the victim to "stay away." Ms. Barbeau claimed that the victim then struck the defendant and wrestled over the gun when she "heard the gun go off, but ... didn't see anything."

Ms. Barbeau testified that she had several earlier altercations with the victim. She claimed that the victim, upset about her relationship with the defendant, had pushed her down in the shower. She contended that the victim then pinned her to the bed for about fifteen minutes. Ms. Barbeau testified that the defendant knew about several of her prior altercations with the victim.

On cross-examination, Ms. Barbeau admitted threatening to have the victim's "ass kicked." She also conceded that after she argued with the victim sometime earlier, an acquaintance of the defendant's had threatened to beat the victim. Ms. Barbeau also acknowledged several inconsistencies between her trial testimony and her pretrial statements to police. She conceded that the defendant was angry when they went to the victim's condo that evening and that she had overheard the defendant make other threats against the victim.

Marianne Hathcock, Ms. Barbeau's mother, testified that the victim called her house several times on the day of the shooting. She described the victim as getting more and more angry with each call. Ms. Hathcock also testified to a prior incident when the victim, accompanied by a group of his friends, came to her house carrying baseball bats in a threatening manner. She claimed that she had seen bruises on the lower part of Ms. Barbeau's body shortly after the shooting.

The defendant testified that he was aware that the victim had previously resorted to physical violence during arguments with Ms. Barbeau. The defendant claimed that he overheard portions of the phone calls the victim made to Ms. Barbeau's mother's house just prior to the shooting and that on one occasion, when he answered the telephone, he was threatened by the victim. He contended that when they arrived at his residence just prior to the shooting, the victim threw Ms. Barbeau to the ground and asserted that the victim had struck her when she knocked on the door. Fearing Ms. Barbeau was injured, the defendant claimed that he retrieved his gun from the trunk, went to the front porch where she lay, and himself had been struck by the victim when the gun went off.

## I

The defendant's first argument is that the trial court erred by charging Tenn.Code Ann. § 39–11–611(b), a statute which defines self-defense in the context of the defense of one's own residence. The trial court gave extensive jury instructions on the issue. A portion of the instruction provided as follows:

Any person using force intended or likely to cause death or serious bodily injury within his own residence is presumed to have held a reasonable fear o[f] imminent peril of death or serious bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or he unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

See Tenn.Code Ann. § 39–11–611(b). The state requested this charge on the basis that "[the victim] has every right to go after [the defendant]—and there's a presumption he was acting in self-defense...." During summation, the state argued that "if someone is attacked at their residence, they are presumed to be acting in self-defense."

The defendant contends that this instruction was erroneous for two reasons: first, the

statute was simply inapplicable to these facts because the victim, not the defendant, was acting in defense of his residence and the statute was intended to govern defenses to prosecution, not to justify a victim's conduct; second, the instruction improperly shifted the burden of proof on the issue of self-defense. We will address each of these arguments separately.

■ The trial judge has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn.), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986); *see* Tenn.R.Crim.P. 30. Clearly, the instructions were simply not applicable to the facts of this case. Tenn.Code Ann. § 39–11–601 provides that "[i]t is a defense to prosecution that the conduct of the person is justified under this part." Self-defense qualifies as justification. Tenn.Code Ann. § 39–11–611. The plain language of the statute is that self-defense may be utilized in defense of the prosecution; it is not, however, any justification for a victim's conduct. Thus, the instruction was not warranted by the facts.

■ The state has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. Tenn.Code Ann. § 39–11–201(a)(3) provides that "No person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt: ... The negation of any defense to an offense defined in this title...." Self-defense qualifies as such a defense. *See* Tenn.Code Ann. §§ 39–11–601 and 39–11–611. An instruction like that given here, to justify the victim's conduct, does tend, in our view, to impermissibly shift the burden of proof to the defendant. Moreover, due to the circumstances of the shooting, the instruction would likely confuse the jury even if it did not have the effect of shifting the burden of proof. In short, it should not have been used in this case.

Subpart (a) of the self-defense statute, which is applicable to the facts presented at trial, provides as follows:

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of *unlawful force*....

Tenn.Code Ann. § 39–11–611(a) (emphasis added). Subpart (b) of the self-defense statute, which tended to excuse any possible misconduct by the victim, provides as follows:

Any person using force intended or likely to cause death or serious bodily injury within their own residence is *presumed* to have held a reasonable fear ... when that force is used against another person ... who *unlawfully* and *forcibly* enters or had unlawfully and forcibly entered the residence....

*See* Tenn.Code Ann. 39–11–611(b) (emphasis added).

■ In our view, the defense provided for in subsection (a) arises only when the defendant is protecting himself from *unlawful* force. Under subsection (b) the victim's conduct is "presumed" to be justified and the defendant's conduct is described as "unlawful." Thus, the only way the defendant could employ the self-defense theory would be to overcome this presumption of justification on the part of the victim. The state has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists. *See* Tenn.Code Ann. § 39–11–201(a)(3).

■ We now turn to the question of whether the error here may have been harmless. The essential question is whether the error more probably than not affected the verdict of the jury. *See* Tenn.R.App.P. 36(b). If an error is of constitutional dimensions, there must be a reversal unless the error is harmless beyond a reasonable doubt. *State v. Carpenter*, 773 S.W.2d 1 (Tenn.Crim.App. 1989). We believe that the erroneous instruction here was harmless when viewed in context with the entire charge. Jury instructions must be read as a whole rather than in isolation. *See State v. Phipps*, 883 S.W.2d 138, 142 (Tenn.Crim.App.1994). While it may have been the intention of the state, in asserting that the instruction was warranted, to justify the victim's conduct, and, while the state placed emphasis on the instruction during closing argument, the trial judge charged

the jury as if the statute merely afforded one other possible defense offered by the defendant. The applicable subsection of the self-defense statute was properly charged. At the conclusion of the self-defense instruction, the trial court correctly pointed out that the burden was on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense. That, in our view, served to mitigate any adverse consequences from the erroneous charge. Under all of the circumstances, we must conclude that the charge, in context, was not harmful to the defendant under any standard.

## II

■ As his second issue, the defendant claims that the prosecutor was guilty of misconduct during the trial by asking the defendant whether he had "called the mother of th[e] victim to say [he was] sorry for what happened...." After the defendant objected to this question, the prosecutor did rephrase his question but essentially asked the same thing. The trial court sustained each of the defendant's objections. No curative instructions were given. The defendant now asserts that the question had no legitimate purpose and that the conviction should be reversed because of the misconduct.

■ In our assessment, the state's conduct did not amount to prosecutorial misconduct. The test to be applied in reviewing a claim of prosecutorial misconduct is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." *Harrington v. State*, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965). The factors, set out in *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim.App.1976), and adopted by the Tennessee Supreme Court in *State v. Buck*, 670 S.W.2d 600, 609 (Tenn.1984), are as follows:

(1) the conduct complained of, viewed in light of the facts and circumstances of the case;

(2) the curative measures undertaken by the court and the prosecution;

(3) the intent of the prosecutor in making the improper statement;

(4) the cumulative effect of the improper conduct and any other errors in the record; and

(5) the relative strength or weakness of the case.

While no curative measures were taken, the conduct complained of was minor when viewed in the context of the whole trial. We are unable to discern any improper motive. Because the other required factors for our determination did not indicate any prejudicial effect, we have found no error in this instance.

## III

■ As his third issue, the defendant claims the trial court erred by refusing to permit defense counsel to cross-examine Detective Dan Stewart about certain pretrial statements of the defendant. We agree.

The defendant had made exculpatory claims to police during the course of the investigation. Detective Stewart made no attempt to either verify or discredit those claims. For example, the defendant insisted at trial that he told the detective that the trench coat he was wearing at the time of the shooting was torn in his struggle with the victim. The detective did not inspect the trench coat. The defendant now argues that the detective's failure to follow up on the lead established the bias of the detective. The trial court sustained the state's objections to this line of questioning, based upon its conclusion that the claims involved self-serving hearsay.

In *State v. Howell*, 868 S.W.2d 238 (Tenn. 1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994), our supreme court reviewed a similar action. In *Howell*, the defendant tried to cross-examine a state witness with evidence the trial court characterized as "self-serving hearsay." *Id.* at 252. The only factual difference between *Howell* and this case is that here, the self-serving statements were originally uttered by the defendant, whereas in *Howell*, the statements were originally made by the witness under cross-examination. *Id.* Our supreme court held that the statements were not hearsay because they were not being offered to prove the truth of the matter stated. *Id.;*

*see* Tenn.R.Evid. 801(c). Further, the court found the limitation on cross-examination violated the defendant's confrontation rights under the Sixth and Fourteenth Amendments to the U.S. Constitution, and Art. I, § 9 of the Tennessee Constitution. *State v. Howell,* 868 S.W.2d at 252.

▮ We find *Howell* to control here. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R.Evid. 801(c). We believe that the statements here were offered to show the detective's bias, thereby admissible, and not to prove the truth of their content.

The Sixth Amendment provides that the accused shall have the right to be "confronted with the witnesses against him." U.S. Const. Amend VI. "Confrontation means more than being allowed to confront the witness physically." *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). It includes the right to an "effective cross-examination." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). A witnesses' bias is " 'always relevant as discrediting the witness and affecting the weight of his testimony.' " *Davis v. Alaska,* 415 U.S. at 316, 94 S.Ct. at 1110 (quoting 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)); *see also* Tenn.R.Evid. 616.

We are cognizant of the general policy against allowing the defendant's self-serving statements to be admitted without the defendant taking the stand:

"A declaration made by a defendant in his own favor [with certain exceptions], is not admissible for the defense. A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness. If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence."

*Hall v. State,* 552 S.W.2d 417, 418 (Tenn. Crim.App.1977) (quoting Wharton's Criminal Evidence, 13th Edition, § 303). However, this policy must yield to the constitutional requirements that the accused be allowed to confront the witnesses against him.

▮ We now address the question of whether this error was harmless. In *Howell,* our supreme court announced the standards for determining when constitutionally improper restrictions on the right to cross-examine constitute harmless error:

[T]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, the error was nonetheless harmless beyond a reasonable doubt. A number of factors are relevant to this inquiry, including the importance of the witness' testimony in the prosecution's case, the cumulative nature of the testimony, the presence or absence of evidence corroborating or contradicting the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case.

*State v. Howell,* 868 S.W.2d at 253 (citations omitted).

The importance of this witness' testimony to the state's case and the cumulative nature of his testimony suggest the error was harmless beyond a reasonable doubt. Moreover, the defendant was otherwise allowed a vigorous cross-examination. The detective's testimony established the foundation for the admission of several items into evidence and proved venue in Knox County. He also testified that Ms. Barbeau did not show any physical signs of having been in a struggle with the victim. The primary issue in this case was whether the shooting was in self-defense. In our view, the detective's testimony provided little, if any, insight on the issue of self-defense; certainly, the testimony was relatively insignificant to the state to show that the killings were not in self-defense. Thus, the error, in context, qualified as harmless beyond a reasonable doubt.

## IV

▮ As his fourth issue, the defendant claims the trial court erred by refusing to allow counsel for the defense to question Angie Barbeau on redirect about her pretrial statements. We agree that the questions

should have been allowed but also find this error to have been harmless.

During the cross-examination of Ms. Barbeau, the state referred extensively to statements she had previously made to the police. At one point, Ms. Barbeau appeared to have contradicted herself about whether she believed the shooting was in self-defense. A second inconsistency was whether Ms. Barbeau ever heard the defendant offer anyone money to beat the victim. Defense counsel objected, arguing that the statements suggesting the inconsistencies were taken out of context and that the full context of the statements would show there to be no inconsistencies. The trial court overruled the objection but assured defense counsel that he could address the issue on redirect. On redirect, however, the trial court refused to allow any inquiry about the context of the statements.

In *State v. Boyd,* 797 S.W.2d 589 (Tenn. 1990), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 (1991), our supreme court cited the following rule:

> The general rule is, subject to certain exceptions, that evidence of prior consistent statements may not be used to rehabilitate an impeached witness. This is not what occurred in this case. The State was allowed to place in proper context supposedly inconsistent statements brought into evidence by the defendant. Where specific questions and answers taken out of context do not convey the true picture of the prior statement alleged to be inconsistent, it is unfair to permit reference to isolated, unexplained responses by the witness and there is no error in allowing the statements to be placed in context. *See Cole v. State,* 498 S.W.2d 915, 917 (Tenn.Crim. App.1973).

*Id.* at 593–94.

The Tennessee Rules of Evidence also suggest that the trial judge should have allowed the statements to be placed in context. The Rule of Completeness provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Tenn.R.Evid. 106.

The rationale of *Boyd* applies here. The defendant should have been permitted to show the full context of the statements. The state's use of the statements present the context of the statements in the light most favorable to its theory. The full context of the statements in their complete form presented a different perspective. By suggesting that Ms. Barbeau had heard the defendant threaten the victim, the state made relevant her assertion that she never heard the defendant offer anyone money to kill the victim. By suggesting Ms. Barbeau was untruthful in her assertions that the shooting was in self-defense, the state made relevant her denial that the shooting occurred from several feet.

■ We now turn to whether the error was harmless. *See* Tenn.R.App.P. R. 36(b). We are mindful that Ms. Barbeau was a major witness offered by the defendant to corroborate his testimony about self-defense. Further, the transcript shows that the effective cross-examination of Ms. Barbeau seriously undermined her credibility. It is unlikely, however, that proof of the full text of these statements would have helped restore her credibility. The state successfully impeached Ms. Barbeau on a number of other issues as well. It is unlikely, in our view, that proof of the complete statements would have helped. Thus, we hold that this error did not affect the verdict.

V

As his fifth issue, the defendant claims the trial court erred by refusing to allow the defendant to introduce the full text of each of his statements after the state had completed its cross-examination. The defendant gave three pretrial statements to the police. All three statements were given within a twelve-hour period shortly after the shooting. The state effectively cross-examined the defendant by pointing out several inconsistencies between statements and the defendant's trial testimony. At the conclusion of the cross-examination, the defense requested that all three of the statements be submitted in their entirety into evidence.

A jury-out hearing was held to determine the admissibility of the statements. The state argued certain parts of the statements should be redacted. The trial court agreed and ruled that various specified parts of the statements had to be omitted before they could be introduced into evidence. In this appeal, the defendant argues the entire text of all three statements should have been allowed. We cannot agree that the entire text of each statement should have been admitted.

A prerequisite to the admissibility of any evidence is relevance. Tenn.R.Evid. 402. Parts of the statements clearly contain irrelevant information, such as how much bond was to be set for the defendant's release.

In *Curry v. State*, 217 Tenn. 257, 397 S.W.2d 179 (1965), our supreme court held that if the defendant is cross-examined in great detail from his prior statements, "the entire statement should be admitted, but that parts of it that are not relevant might be excluded." *Id.* 397 S.W.2d at 182 (citations omitted). The *Curry* court continued,

> We are not saying that normally in a situation of this kind the entire statement should be allowed to go to the jury regardless of whether it bears on the point of contradiction or not (some courts go to this extent, that the entire statement is entitled to go in regardless of what it says). We do not go that far, but we think, even on cross-examination for the purposes of impeaching, that normally statements should be offered so that Court would have an opportunity to pass on whether or not other statements made there, are in anywise pertinent, and also to determine whether or not to exclude portions of the statement not relevant to the items thereof which have been introduced.

*Id.* at 182–83.

Also, in *State v. Adkins*, 710 S.W.2d 525, 528–29 (Tenn.Crim.App.1985), the court held the part of the defendant's statement about his willingness to take a lie detector test was inadmissible because of case law holding that evidence of the willingness or unwillingness to take a lie detector test is irrelevant. The *Adkins* court relied on *Curry* to exclude part

of the statement containing references to the lie detector test. *Id.*

▮ We now turn to the question of whether each part which was excluded was irrelevant and, therefore, properly stricken. The defendant's first statement, a two-page transcript of a taped telephone conversation between the defendant and Detective Bernie Lyon, was ruled inadmissible in its entirety. Arguing against admission, the state asserted the statement was irrelevant because the state had not cross-examined the defendant from that particular statement; the defendant, conceding that the state had not done so, claimed the statement was relevant because it contained prior consistencies which would show the full context of all of his pretrial statements.

As stated previously, prior consistent statements may be admitted to place in proper context alleged inconsistencies brought out by opposing counsel. *State v. Boyd*, 797 S.W.2d at 593–94. The defendant maintains that the telephone conversation should have been admitted for this purpose. We agree.

During direct examination, the defendant claimed that the shooting occurred after the victim charged at him and that the shooting was in self-defense. Also, he contended that he did not realize he had actually shot the victim because the victim had walked back into the house without staggering or making any other gestures that would indicate he had been injured.

The state impeached the defendant on these assertions by using his second and third pretrial statements. For example, much of the state's cross-examination consisted of the state using parts of the statements which might suggest the shooting was not in self-defense. Also, the state quoted from the defendant's second statement, where the defendant said that although he did not see any blood on the defendant, Ms. Barbeau had seen bleeding. The state used this statement to suggest the defendant knew he had shot the victim.

In the taped conversation, the defendant provided Detective Bernie Lyon with an abbreviated version of the shooting. Specifically, he claimed that the victim charged at him

and the gun went off while they were wrestling and that he did not realize he had actually shot the victim.

The assertions in the taped conversation qualified as prior consistent statements which might have served to rehabilitate the trial testimony of the defendant and would have placed the inconsistencies in proper context. In our view, the statement should have been admitted under the standards announced in *Boyd, supra.*

We must also address the state's contention that because the defendant was not cross-examined by the actual use of the statement, the conversation should not have been admitted for any purpose. We cannot agree. The Rule of Completeness provides, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part *or any other writing or recorded statements* which ought in fairness to be considered contemporaneously with it." Tenn.R.Evid. 106. Here, while the defendant was cross-examined only from his other two pretrial statements, the contents of this first statement, which was given only hours before the remaining two statements, were relevant to establish the context of all of the statements. The statements cannot be treated in isolation.

The defendant's second statement, six pages in length and given at 1:58 a.m. shortly after the shooting, had portions stricken. In the statement, the defendant claimed that the victim had been arrested for assaulting several different women, one of whom had to be hospitalized, and that the victim took medication for "his temper" or some sort of mental condition. The trial court held that these portions had to be omitted before the statement could be admitted into evidence, despite the defendant's arguments that these parts of the statement showed his state of mind (i.e., he feared the victim).

The defendant testified on direct that he was aware of the prior acts of violence committed by the victim and thus, these statements might qualify as prior consistent statements. Prior consistent statements are not admissible, however, unless the defendant is impeached about some matter to which the prior statements pertain. *See State v. Meeks,* 867 S.W.2d 361, 374 (Tenn.Crim.App. 1993). The defendant was not impeached in any manner on this issue; thus, there was no need to admit the prior consistent statements to rehabilitate the defendant or to show the context of the statements. That the defendant thought the victim took medication to control his temper was not brought out on direct and this fact may have been relevant to establishing the defendant's fear of the victim.

The defendant's third statement, a seventeen page statement given at 7:26 the morning after the shooting, also had portions stricken. When Detective Stewart asked the defendant if he knew where Adams had taken the gun, the defendant responded:

> Um, at first he said he was taking it to ... Jeff ... and at first he said he was gonna go put it in the trunk of there and then ... he said he was gonna go move it again cause that [wasn't] a good place. And ... he tried to tell me downstairs.... I asked him cause I was gonna come tell ya'll where it was cause ya'll said that ... if I had the gun that that would help me out. But that guy down there in the holding cell wouldn't let us talk.

This portion was excluded.

The conversation between the defendant and Adams about where Adams hid the gun is irrelevant, as it does not make the "existence of any fact that is of consequence ... more probable or less probable...." Tenn. R.Evid. 401. First, the defendant was not cross-examined in any fashion about this conversation. Even if it were relevant, there are multiple layers of hearsay. The statements from Adams to the defendant qualify as the first layer of hearsay. When the defendant repeated the statements to Stewart, there was a second layer of hearsay. *See* Tenn.R.Evid. 801 and 802. In our view, this portion was properly excluded.

To analyze the next portion, the transcript of part of the statement is reproduced in full, with portions that were redacted reproduced in italics:

Detective Stewart: ... What the witnesses will testify to is that you pulled the weapon out. You displayed it ... they saw the laser sight activated and Brian was then shot and he was shot at some distance away he wasn't shot at close range like you've told us.

The defendant: O.K. Well I've got a busted lip. Where he came and punched me in the lip. Ya know that's that should be evidence on my part. He came ... I was on the porch and I told I told ya'll that I did point the gun at him and I put the laser, but I put laser on his head.

*Detective Stewart: According to Angie ... she says that the dot [the beam from the laser on the gun] appeared on him before you got out of the automobile. Now, you explain that to me.*

*The defendant: The dot appeared on him before.*

*Detective Stewart: The dot appeared before you got out of the car.*

*The defendant: ... That's impossible.*

*Detective Stewart: It's not impossible. She saw it. She recognized it.*

*The defendant: My laser won't ... go through a windshield.*

Detective Stewart: I'm not saying how the dot appeared. I'm just telling you what she told me. The other witnesses are going to testify that ... the sight was activated prior to the shooting in the vicinity of the front porch. There was not a struggle between you and Brian ... Shaver and we've got more than one witness that has told us that.

The defendant: You mean people have said that there was not a struggle between us.

Detective Stewart: There was no struggle reported.

The defendant: But there was a struggle.

Detective Stewart: None reported. The witnesses inside the dwelling that heard this and saw it said you very calmly displayed the weapon, pointed it right at him, and pulled the trigger. They even told us what Brian said after you shot him.

The defendant: Well, I told ya'll what he said after he shot him he stepped back in the door and said now you've did it ... and shut the door.

Detective Stewart: That was the last thing he ever said.

The defendant: Wait a minute, he died?

Detective Stewart: Yes sir he sure did.

The defendant: They said on the news he was. . . .

Detective Stewart: Don't believe everything you hear on the news.

Detective Freeman: Well on the news I believe what the news says you had (inaudible) dead body over at UT hospitable (inaudible) and I'll be going later to see about that.

Detective Stewart: Now you wanna start telling us the rest of the truth about this ... (inaudible) ... or do you want to stick with the story that number one I don't believe and number two Mike Freeman doesn't believe and he's been at this all night like I have.

The defendant: I am ... the only thing. . . .

*Detective Stewart: You're gonna be standing up in court with at least seven people testifying to the exact opposite of what you're telling us.*

*The defendant: The only thing that I did not tell ya'll the truth about was about the gun.*

\*    \*    \*    \*    \*    \*

The Rule of Completeness suggests the portions in italics should not have been redacted. "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Tenn.Rules Evid. 106. The state, in cross-examining the defendant in extensive detail from his prior statements, effectively introduced the defendant's pretrial statements. The full context of the statements, "in fairness" should have been before the jury. Here, the redactions were particularly disturbing. The first redacted portion could have affected how the jury would have interpreted the

rest of what Detective Stewart said to the defendant. It strongly indicates the detective was fabricating facts in order to get the defendant to confess. The fact that the detective was probably fabricating facts in that portion of the statement would affect how much weight to give other parts of what the detective says to the defendant. The second redacted portion was also erroneously redacted. In the statement, the detective repeatedly accuses the defendant of lying. The defendant's response that he had told the truth about everything except the gun was highly relevant to showing the full context of the statements.

■ The final portion of the third statement that was redacted concerned setting bond for the defendant and the detective lecturing the defendant about not being truthful with him. The fact that bond was set for the defendant is irrelevant to the issues in this case, so there was no error in striking that portion of the statement. *See* Tenn.R.Evid. 402. Also, the detective's lecture to the defendant about being truthful was not relevant.

Thus, we hold as follows: (1) error occurred when the first statement was not admitted; (2) no errors occurred in the redactions in the second statement; and (3) error occurred in redacting certain portions of the third statement. We now consider whether the errors were harmless. *See* Tenn.R.App.P. 36(b); Tenn.R.Crim.P. 52(b).

■ The redactions in the third statement are clearly harmless error. Very minor portions of the seventeen page statement were redacted. Also, aside from the redacted portion, there were many other instances where the defendant insisted he was being truthful. The redactions in the third statement are not reversible error.

■ The harmless error analysis is more difficult as applied to the admission of the first statement. The defendant was not allowed to present a statement in which he said the gun was in the trunk or in his lap on the trip to the victim's condo, the shooting was in self-defense, and he did not realize the victim had actually been shot. We nevertheless conclude that this error did not affect the verdict. We reach this conclusion for several reasons. First, all of these assertions were either in other parts of the defendant's statements which were allowed into evidence or they were testified to by other witnesses. Also, the defendant was impeached on innumerable other matters. Thus, there was not reversible error.

## VI

■ The defendant also claims that the trial court erred by failing to instruct the jury on the lesser included offense of voluntary manslaughter. The defendant argues that there was sufficient evidence that he acted with passion produced by adequate provocation to warrant the additional instructions. In response, the state contends that the evidence simply did not support such an instruction.

The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn.), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986). It is settled law that when "there are any facts that are susceptible of inferring guilt of any lesser included offense or offenses, then there is a mandatory duty upon the trial judge to charge on such offense or offenses. Failure to do so denies a defendant his constitutional right of trial by a jury." *State v. Wright*, 618 S.W.2d 310, 315 (Tenn.Crim.App. 1981) (citations omitted); Tenn.Code Ann. § 40–18–110(a). When there is a trial on a single charge of a felony, there is also a trial on all lesser included offenses, "as the facts may be." *Strader v. State*, 210 Tenn. 669, 675, 362 S.W.2d 224, 227 (1962). Trial courts, however, are not required to charge the jury on a lesser included offense when the record is devoid of evidence to support an inference of guilt of the lesser offense. *State v. Stephenson*, 878 S.W.2d 530, 549–50 (Tenn. 1994); *State v. Boyd*, 797 S.W.2d 589, 593 (Tenn.1990), *cert. denied*, 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 (1991); *State v. Dulsworth*, 781 S.W.2d 277, 287 (Tenn.Crim. App.1989).

In *Wright v. State*, 549 S.W.2d 682 (Tenn. 1977), our supreme court confirmed the test to determine whether an offense is lesser and

included in the greater offense. Quoting the late Justice Weldon White in *Johnson v. State*, 217 Tenn. 234, 243, 397 S.W.2d 170, 174 (1965), the court ruled as follows:

> The true test of which is a lesser and which is a greater crime is whether the elements of the former are completely contained within the latter, so that to prove the greater the State must first prove the elements of the lesser.

*Wright v. State*, 549 S.W.2d at 685–86.

Two years later, the supreme court again addressed the subject:

> We believe that the better rule, and the one to be followed henceforth in this State, is the rule adopted implicitly by this court in *Wright v. State*, *supra*, that, in this context, an offense is necessarily included in another if the elements of the greater offense, as those elements are set forth in the indictment, include, but are not congruent with, all the elements of the lesser. If there is evidence to support a conviction for such a lesser offense, it must be charged by the trial judge. T.C.A. § 40–2519 [now Tenn.Code Ann. § 40–18–118(a) ]; *Whitwell v. State*, 520 S.W.2d 338 (Tenn.1975).

*Howard v. State*, 578 S.W.2d 83, 85 (Tenn. 1979).

■ Trial judges should charge the jury on lesser included offenses charged in the indictment whether requested to do so or not. Tenn.Code Ann. § 40–18–110(a). Failure to instruct on a lesser included offense denies a defendant his constitutional right to trial by jury. *State v. Wright*, 618 S.W.2d 310, 315 (Tenn.Crim.App.1981).

Here, the defendant was charged with first degree murder. The lesser included offenses of second degree murder and negligent homicide were properly included in the jury charge. Voluntary manslaughter, a lesser grade of first degree murder, was not charged. *See State v. Trusty*, 919 S.W.2d 305, 311 (Tenn.1996), (explaining that voluntary manslaughter is a lesser grade of first-degree murder); *Howard v. State*, 506 S.W.2d 951 (Tenn.Crim.App.1973). It is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn.Code Ann. § 39–13–211(a). The court in *Trusty* held that "if the evidence would support a conviction for the offense, defendants are entitled to jury instructions . . . on all offenses which are a lesser grade or class of the charged offense." *State v. Trusty*, 919 S.W.2d at 311.

The defendant argues that there was enough evidence that he acted in a state of passion due to the provocation of the victim to warrant instructions on voluntary manslaughter. We must agree. The defendant testified that he knew of prior acts of violence by the victim. There was tension between the defendant and the victim because of the competing interests in the same woman. There was testimony that the victim struck the defendant and had also beaten Ms. Barbeau shortly before the shooting. Ms. Barbeau conceded that the defendant was angry with the victim on the evening of the shooting. The evidence offered, even if unpersuasive, provided support to the theory of defense.

■ The guiding principle is that if there is evidence in the record from which the jury could have concluded that the lesser included or grade of offense was committed, there must be an instruction for the lesser offense. *Id.; see Johnson v. State*, 531 S.W.2d 558, 559 (Tenn.1975). To rule otherwise would effectively deprive any defendant of a jury trial on the lesser offense. That is a constitutional entitlement. Whether there was, in fact, adequate provocation to warrant consideration of voluntary manslaughter was a question of fact for the jury, not one of law for the trial court.

Recently, Judge Welles spoke for this court in its determination that an omission of a lesser included offense from the charge to the jury always requires a new trial. *State v. Dhikr Abban Boyce*, 920 S.W.2d 224 (Tenn. Crim.App.1995). The opinion included a quote from *Poole v. State*, 61 Tenn. 288, 294 (1872):

> However plain it may be to the mind of the Court that one certain offense has been committed and none other, he must not confine himself in his charge to that of-

fense. When he does so he invades the province of the jury, whose peculiar duty it is to ascertain the grade of the offense. However clear it may be, the Court should never decide the facts, but must leave them unembarrassed to the jury.

*State v. Dhikr Abban Boyce,* 920 S.W.2d at 227.

While the evidence of provocation may have lacked credibility, we must hold that voluntary manslaughter should have been charged as a possible, lesser grade of offense. It is unfortunate that this omission, in the face of strong convicting evidence, mandates a reversal of the conviction and the grant of a new trial.

## VII

█ In his final issue, the defendant challenges the trial court's imposition of a twenty-five (25) year sentence, the maximum for second degree murder. Although the defendant is entitled to a new trial, we will nonetheless address the question of whether the sentence was excessive.

When a challenge is made to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a "de novo review ... with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn.Code Ann. § 40–35–401(d). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn.Code Ann. §§ 40–35–102, –103, and –10.

At the time of this offense, the presumptive sentence was the minimum in the range if there were no enhancement and mitigating factors. Tenn.Code Ann. § 40–35–210

(amended in 1995 changing the presumptive sentence for a Class A felony to the midpoint in the range). Should the trial court find mitigating and enhancement factors, it must start at the minimum sentence in the range and enhance the sentence based upon any applicable enhancement factors, then reduce the sentence based upon any appropriate mitigating factors. Tenn.Code Ann. § 40–35–210(e). The weight given to each factor is within the trial court's discretion provided that the record supports its findings and it complies with the Sentencing Act. *See State v. Ashby,* 823 S.W.2d 166, 169 (Tenn.1991). The trial court, however, should make specific findings on the record which indicate his application of the sentencing principles. Tenn.Code Ann. §§ 40–35–209 and –210.

At the sentencing hearing, the trial court found the following enhancement factors applicable:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn.Code Ann. § 40–35–114(1).

(2) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. Tenn.Code Ann. § 40–35–114(8).

(3) The defendant possessed or employed a firearm ... during the commission of the offense. Tenn.Code Ann. § 40–35–119(9).

(4) The defendant had no hesitation about committing a crime when the risk to human life was high. Tenn.Code Ann. § 40–35–114(10).

(5) The crime was committed under circumstances under which the potential for bodily injury to a victim was great. Tenn. Code Ann. § 40–35–114(16).

The defendant does not challenge the application of the first three enhancement factors. He has an extensive juvenile record of criminal conduct which includes multiple sales of LSD, the sale of marijuana, the sale of cocaine, reckless driving, misdemeanor theft,

and shoplifting.[1] The fact that some of the juvenile offenses were committed while the defendant was on probation for earlier juvenile offenses demonstrates the defendant's unwillingness to comply with conditions of release. The evidence also clearly established that the defendant used a firearm to commit the offense.

 The defendant, however, challenges the application of the fourth and fifth factors. He argues that Tenn.Code Ann. § 40–35–114(10), the defendant had no hesitation about committing a crime when the risk to human life was high, cannot be used to enhance his sentence because that factor is inherent in the offense of second degree murder. We agree. *See State v. Jones,* 883 S.W.2d 597, 603 (Tenn.1994). To justify using this factor, the state must prove the defendant "demonstrated a culpability distinct from and appreciably greater than that incident to the offense for which he was convicted." *Id.* at 603; *see also State v. Lambert,* 741 S.W.2d 127, 134 (Tenn.Crim. App.1987) (appropriate use of this factor in a homicide case where the defendant's conduct posed a threat to a large number of people before the particular victims were killed).

 The defendant also disputes the applicability of Tenn.Code Ann. § 40–35–114(16), that the potential for injury to the victim was particularly great. In *Daugherty,* this court held that the factor was an element of any homicide case and, therefore, could not be considered to enhance a sentence. *State v. David Keith Daugherty,* No. 03C01–9203–CR–00082, 1993 WL 330454 (Tenn. Crim.App., at Knoxville, August 27, 1993). We agree that this factor should not have been used.

The defendant also contends that the trial court erred by refusing to apply these two mitigating factors:

(1) Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense. Tenn.Code Ann. § 40–35–113(3); and

(2) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct. Tenn.Code Ann. § 40–35–113(11).

 At the sentencing hearing, the trial court expressly ruled that mitigating factors did not apply. The defendant presented no evidence to justify or excuse the killing other than that provided at trial. Further, the defendant armed himself and carried the weapon from his automobile to the scene of the killing. After the shooting, the defendant disposed of the gun and then lied to the police about it. These facts suggest a "sustained intent to violate the law." Thus we concur in the finding by the trial court that there were no mitigating factors.

Finally, the trial court gave great weight to the first three enhancement factors and announced on the record that he gave "little weight" to the last two factors, because of concerns that those factors were inherent in the elements of the crime. Even if some evidence of mitigation did exist, the applicable enhancement factors so strongly outweigh the mitigating factors that the maximum sentence would have been warranted.

In summary and despite the existence of several mistaken rulings on matters of evidence, we find only one error that warrants reversal. Because the trial court failed to instruct the jury on all the possible lessor included or grades of offenses as required by law, the judgment must be reversed and the cause remanded for a new trial.

TIPTON, J., and JOHN K. BYERS, Senior Judge, concur.

---

1. *State v. Adams,* 864 S.W.2d 31, 34 (Tenn.1993) provides that "a juvenile record of criminal conduct may properly be considered in assessing a suitable sentence upon a felony conviction by an adult" (quoting *State v. Stockton,* 733 S.W.2d 111, 112–13 (Tenn.Crim.App.1986)).