IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 17, 2002

## STATE OF TENNESSEE  v.  ANDRE D. KIMBROUGH

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-B-1111     Steve R. Dozier, Judge**

---

**No. M2001-02149-CCA-R3-CD - Filed December 3, 2002**

---

Defendant, Andre Kimbrough, appeals his conviction in the Davidson County Criminal Court for second degree murder.  Defendant argues that the trial court erred by: 1) failing to act as a thirteenth juror; 2) permitting the State to impeach the Defendant using prior bad acts without giving proper notice to the Defendant; and 3) not applying certain mitigating factors in sentencing Defendant.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**.

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Edward S. Ryan, Nashville, Tennessee, for the appellant, Andre D. Kimbrough.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Renee Erb, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Facts

On December 28, 1998, Defendant shot and killed Cedric Martin.  The victim's girlfriend, Melissa Hunter, testified that on that morning, she and the victim were driving down North Sixth Street in Nashville, a couple of streets from where the victim lived with his mother.  They drove past two men walking down the street.  The victim said, "Oh, there's my boy," and pulled over on the side of the street. He backed up to where the men were standing.  Hunter testified that the victim got out of the car, and he and the Defendant gave each other a "high five."  They were talking and laughing, but she could not hear what was being said.  The three men stood on the sidewalk beside the car and talked for about ten minutes.  The victim opened the car door and picked up his cell phone, which was lying in the driver's seat, and threw it into Hunter's lap.  He put one foot inside

the car to get in, and Defendant grabbed his pocket. The victim got out of the car and let the car door shut. Hunter saw Defendant grab the victim's pocket a few more times, and the victim pushed Defendant away each time in a playful manner. The last time this happened, the victim pushed Defendant hard enough to make Defendant stumble and lose his balance. Hunter testified that Defendant's facial expression then changed to anger. Defendant came towards the victim and jumped up and grabbed him in a headlock. Hunter saw "fire" come out of Defendant's sleeve. The victim appeared to be hurt, and she saw him take off running down the street. Defendant ran after him.

Hunter got into the driver's side of the car and drove away. As she did, the third man ran away from the scene in the same direction in which she was driving. Hunter drove a couple of streets away and stopped the car because the victim's cell phone rang. She answered it, thinking it might be the victim calling from his mother's house, but it was not. She then returned to the street where she left the victim. She saw police cars and the victim's sweater lying in the street, but the victim and Defendant were gone. She testified that five minutes elapsed between the time she drove away and when she returned. Hunter also testified that she had been with the victim since the night before, and at no time did she see him with a gun.

Kevin Robinson testified for the defense at trial. He was with Defendant on the morning of the shooting. He and Defendant were on North Sixth Street when the victim drove by. The victim backed his car up to where they were standing, got out of the car, and began talking with Defendant. Robinson testified that they began to argue over $100, which Defendant apparently owed the victim. He saw the victim get in his car, and then get back out and begin arguing with Defendant again. While they were arguing, Robinson started to walk away from them. He heard three gunshots and turned around to look back. He saw the two men struggling, but he could not tell which one had control of the gun. He testified that he had been with Defendant all morning, and that he did not see Defendant with a gun. On cross-examination, however, Robinson testified that at one point, he saw Defendant and the victim circling each other, and Defendant was threatening the victim with a gun. He also admitted that after the shooting, he told police that the victim did not have a gun and that Defendant did have one.

The morning of the shooting, Zachary Newsom was inside his house on North Sixth Street, watching television with his daughter when he heard gunshots. Mr. Newsom went outside, where he saw Defendant, whom he knew from around the neighborhood, and another man having a confrontation in the street. Mr. Newsom testified that Defendant had a gun, and he was holding it in the air, pointing it at the victim. He testified that the victim was shielding his face from Defendant, and that the two men were circling each other in the street. Mr. Newsom testified that the victim was "trying to get out from under that pistol." Mr. Newsom did not see a weapon in the victim's hand. The victim was holding what appeared to be two twenty dollar bills in one hand. Mr. Newsom could not see Defendant's face, and he did not hear what Defendant and the victim were saying to each other, but he testified that, judging by the victim's body language, he appeared to be "pleading for his life." Mr. Newsom began to approach the two men, saying, "Don't go out like that." Defendant and the victim made one complete circle around each other, and then Defendant

shot the victim. Mr. Newsom remembered hearing two gunshots. After Defendant shot the victim, he ran past Mr. Newsom and said, "You didn't see nothing." Mr. Newsom said, "Yeah, right," and then went inside the house next door to get a towel. He went over to the victim to help him, and could see that the victim had been shot in the eye.

The pathologist testified that the victim died from multiple gunshot wounds to the left eye, the abdomen, and the right hand. The wound to the victim's hand was such that the palm of his hand was facing the gun. He had no bruises on his body to indicate that he had been physically fighting.

Two other witnesses testified that they saw Defendant shoot the victim in the street on the morning of December 28, 1998. Jean Osborne was inside cooking when she looked out the kitchen window and saw two men "playing around" with each other beside a car. One of the men pushed the other away and ran down the street. He was running hard and zigzagging back and forth across the street. Defendant was chasing him and shooting at him. Ms. Osborne ran to her living room to check on her children. When she looked out her front door, she saw that the victim had fallen in the street. She testified that Defendant ran up to him, stood over him, and shot two or three more times. After the victim fell, Defendant stood straddling the victim and said something to him. Then, Defendant walked away from the victim.

Yolanda Brooks, who lived near the location of the shooting, testified that she was asleep in bed when she heard the sounds of gunshots and tires squealing. She jumped up and looked out her bedroom window. She saw Defendant standing in the street, pointing a gun at the victim's face. The victim and Defendant did not appear to be fighting. Next, she saw Defendant shoot the victim. She put on her robe and coat to go outside. When she got outside, Defendant was gone. Ms. Brooks never told the police or the District Attorney what she saw. She only decided to come forward on the day she gave her testimony.

Detective Tim Mason assisted in locating Defendant in connection with the shooting of the victim. In March of 1999, he received information that Defendant was at an apartment complex in Nashville. He and another officer drove in unmarked police cars to the apartment complex. They drove past Defendant, who was sitting in a car outside the complex. They tried to back their cars up to block him in, but Defendant sped away. The officers drove around the building to head him off. When they encountered him on the other side of the building, Defendant jumped out of his car and ran inside the apartment building. After forty-five minutes of negotiations, Defendant came outside and was arrested.

Defendant took the stand in his own defense. He testified that he owed the victim $100 from a bet they had made about a week prior to the shooting. When he saw the victim on the morning of the shooting, the victim asked for the money Defendant owed him, but Defendant did not have it. Then the victim called someone on his cell phone and told whomever he was talking to that he was with Defendant, and he was not going to let him leave. The victim then went to his car and came back over to Defendant without his phone. He pulled out a gun and put it to Defendant's head. Defendant grabbed for the gun and it fired. They were struggling for the gun and leaning against the

back of the victim's car when the victim's girlfriend drove off. They both fell to the ground, and the gun fired again. Defendant testified that a piece of the bullet hit his face. Defendant wrestled the gun away from the victim and when the victim grabbed for it, Defendant shot him. Defendant did not talk to police from the time of the shooting until his arrest in March of 1999.

## II. Verdict Against the Weight of the Evidence

Defendant contends that the trial court erred by failing to act as a thirteenth juror. Defendant argues that the weight of the evidence preponderates against the verdict of the jury. Pursuant to Rule 33(f) of the Tennessee Rules of Criminal Procedure, the trial court has the authority to reverse a jury's verdict when it determines that the verdict is contrary to the weight of the evidence. This Court, however, may not reweigh or reevaluate the evidence on appeal. *See State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). The accuracy of the trial court's determination as a "thirteenth juror" is not subject to appellate review. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)). Once the trial court approves the verdict of the jury and denies a defendant's request for a new trial, our review is limited. *Burlison*, 868 S.W.2d at 719. An appellate court may grant a new trial only where the trial court has "*failed* to act as the thirteenth juror." *Moats*, 906 S.W.2d at 435 (emphasis added). In this case, the trial court approved the jury's verdict by overruling Defendant's motion for new trial. We conclude that the trial court exercised its authority as thirteenth juror. Therefore, we will not disturb the trial court's determination that the weight of the evidence supported the jury verdict.

While a defendant may not challenge on appeal the weight of the convicting evidence, he or she may challenge the sufficiency of the convicting evidence. To the extent that Defendant's argument may be construed as a challenge to the sufficiency of the evidence, we conclude that the evidence was sufficient. Defendant was convicted of second degree murder, which requires proof that Defendant knowingly killed another person. Tenn. Code Ann. § 39-13-210(a)(1). At trial, Defendant did not deny having shot the victim. Instead, he asserted self-defense. When a defendant raises the defense of self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *See State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996).

Defendant submits that the jury could not possibly have reached the verdict it reached. Defendant argues that, viewing the evidence in a light most favorable to the State, the proof is overwhelming that the victim was the original aggressor. Defendant relies on testimony that the victim stopped his car and approached Defendant in the street. He also points out that the State did not present evidence establishing who brought the gun. Whether a defendant acted in his own defense is a question for the exclusive determination of the jury. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). Furthermore, where a defendant provokes the initial use of force, the availability of the defense is negated. Tenn. Code Ann. § 39-11-611(d); *see State v. Inlow*, 52 S.W.3d 101, 109 (Tenn. Crim. App. 2001).

We find ample evidence in the record to support the jury's rejection of Defendant's self-defense claim. Viewing the evidence in a light most favorable to the State, the victim pushed Defendant away after Defendant grabbed at the victim's pockets. Defendant then jumped up and grabbed the victim in a headlock and shot him. The victim ran away from Defendant, and Defendant chased him down the street. Defendant then shot the unarmed victim in the face and ran away. Zachary Newsom testified that he saw Defendant point a gun at the victim's face, and the victim shielded his face and appeared to be "pleading for his life." Kevin Robinson, who testified for the defense, also saw Defendant and the victim circling each other in the street, and he testified that Defendant was threatening the victim with a gun. Jean Osborne testified that she saw Defendant chase the victim down the street and shoot at him. Yolanda Brooks testified that she saw Defendant shoot the victim in his face. Three witnesses, Newsom, Osborne and Brooks, all testified that Defendant and the victim did not appear to be fighting. The only evidence to the contrary is the Defendant's own testimony that he shot the victim while struggling for possession of the gun. Based on the evidence in the record, we conclude that the evidence is sufficient to support beyond a reasonable doubt the Defendant's conviction for second degree murder.

### III. Impeachment Without Proper Notice to Defendant

Defendant contends that the trial court erred by allowing the State to impeach the Defendant with evidence of prior convictions without giving proper notice to the Defendant, in violation of Rule 609(a)(3) of the Tennessee Rules of Evidence. Tennessee Rule of Evidence 609(a)(3) provides that "the State must give the accused reasonable written notice of the impeaching conviction before trial." This means that the State must notify the Defendant in writing that it intends to impeach the Defendant's credibility at trial with a prior conviction. *State v. Farmer*, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992).

Pursuant to Rule 16(a)(1)(B) of the Tennessee Rules of Criminal Procedure, the State furnished Defendant with a copy of his prior criminal record in response to a request for discovery. In its discovery response, the State included the following statement: "Should the Defendant testify at trial, the State intends to use the prior criminal record during cross-examination for impeachment and enhancement purposes, pursuant to *State v. Morgan*, 609 and 405." Prior to the presentation of Defendant's proof, the trial court conducted a jury-out hearing to determine the admissibility of Defendant's prior convictions. After a discussion, the trial court ruled that Defendant's 1997 conviction for possession of cocaine with intent to sell was admissible for impeachment purposes. The trial court found that the State's notice failed to satisfy the requirements of Rule 609(a)(3). The trial court ruled, however, that the State's notice was sufficient, finding that Defendant could not show how the State's technical noncompliance resulted in prejudice to Defendant.

In *State v. Barnard*, 899 S.W.2d 617 (Tenn. Crim. App. 1994), the prosecutor provided the defendant with a discovery response, outlining the defendant's criminal record. In *Barnard*, this Court concluded that the State failed to give notice of its intent to use the prior convictions to impeach the accused, and therefore, the actual notice requirement of Rule 609(a)(3) was not

satisfied. We concluded, however, that the defendant was not prejudiced by the State's failure to comply with Rule 609, and therefore, the error was harmless. *Barnard*, 899 S.W.2d at 622.

Here, as in *Barnard*, the State furnished the Defendant with his criminal record in response to Defendant's request for discovery. Unlike *Barnard*, however, in this case, the State satisfied Rule 609(a)(3) by including a statement of its intent to use Defendant's prior convictions for impeachment purposes. We conclude that the State complied with the requirements of Rule 609(a)(3) by giving written notice of its intent to impeach Defendant with prior convictions.

We do not believe that Rule 609(a)(3) requires the filing of a separate notice. To mandate a separate notice would be to place form over substance. The requirements of Rule 609(a)(3) include that notice be reasonable and written and that a determination be made that the probative value of the impeaching conviction outweighs its prejudicial effect. Therefore, notice in a discovery response is acceptable, as long as it satisfies those requirements. Here, the State provided timely, reasonable, written notice of Defendant's prior convictions and the State's intent to use those convictions to impeach Defendant. Defendant is not entitled to relief on this issue.

## IV. Mitigating Factors

Defendant contends that the trial court erred in sentencing him. Defendant argues that the trial court should have applied the following mitigating factors in determining his sentence: 1) Defendant acted under strong provocation; 2) substantial grounds exist tending to excuse or justify Defendant's criminal conduct, though failing to establish a defense; and 3) Defendant acted under duress even though the duress is not sufficient to constitute a defense to the crime. Tenn. Code Ann. § 40-35-113(2), (3), and (12). The State correctly points out that Defendant has waived the issue by failing to support his argument with citations to authorities and appropriate references to the record as required by Rule 10(b) of the Rules of the Court of Criminal Appeals. Although Defendant's brief is deficient in that regard, we nevertheless address the issue on the merits, and conclude that the trial court properly sentenced Defendant.

When a defendant appeals the nature or length of his sentence, our review of the record is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). We may not disturb the sentence as long as the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act. *State v. Adams*, 45 S.W.3d 46, 56 (Tenn. Crim. App. 2000) (citing *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991)).

Defendant was convicted for second degree murder, a Class A felony. Tenn. Code. Ann. § 39-13-210(b). For a Range I standard offender, the sentencing range for a Class A felony is not less than fifteen and not more than twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The presumptive sentence for a Class A felony is the midpoint in the range, twenty years in this case, when there are no enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). Where one or more enhancement factors apply, but no mitigating factors exist, the trial court may impose a sentence greater than the presumptive sentence, but still within the range. *See* Tenn. Code

Ann. § 40-35-210(d). Where both enhancement and mitigating factors apply, the trial court may enhance the sentence above the presumptive sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). The weight to be afforded to any particular factor is within the trial court's discretion. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; *State v. Hayes*, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995).

At the conclusion of the sentencing hearing, the trial court declined to apply any of the three mitigating factors suggested by the Defendant. The trial court did, however, apply four statutory enhancement factors. The trial court found that the following enhancement factors applied to Defendant's conviction: Defendant has a previous history of criminal convictions or criminal behavior; Defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; Defendant used and employed a firearm; and Defendant committed a felony offense while on probation. Tenn. Code Ann. § 40-35-114(1), (8), (9), and (13)(C). Based on its findings, the trial court sentenced Defendant, a Range I standard offender, to twenty-five years imprisonment, the maximum sentence, to be served consecutively to a sentence he is currently serving for a prior conviction.

Defendant does not challenge the trial court's application of the enhancement factors, and we find no error in the trial court's application of these factors. The trial court adequately stated its reasons for applying the enhancement factors, and the record supports the application of all four enhancement factors. Defendant argues that the trial court should have applied mitigating factors (2), (3), and (12). *See* Tenn. Code Ann. § 40-35-113. The burden is on Defendant to show that his sentence was improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In his brief, Defendant has failed to offer any reasons why these mitigating factors should have been applied, and we find no evidence in the record to warrant their application.

The trial court properly declined to apply mitigating factors (2), (3), and (12). In our view, there was little evidence of provocation or justification. As the trial court noted, the jury rejected Defendant's claim of self-defense, and in doing so, apparently discredited Defendant's testimony. Defendant testified that he shot the victim in the course of a struggle for possession of the gun. Multiple witnesses testified, however, that they saw Defendant chase the victim down the street and shoot him. The victim's girlfriend testified that the victim pushed Defendant onto the ground, but only after Defendant provoked him by grabbing his pockets. We find no evidence to justify the Defendant's use of deadly force, nor do we find evidence that Defendant acted under duress or the domination of another person. Furthermore, even if some evidence of mitigation did exist, the enhancement factors so strongly outweigh the mitigating factors that the maximum sentence is appropriate here. *See State v. Belser*, 945 S.W.2d 776, 792 (Tenn. Crim. App. 1996).

## CONCLUSION

After a careful review of the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE