# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 6, 2009

## STATE OF TENNESSEE v. WILLIE HALL

### Direct Appeal from the Criminal Court for Shelby County
### No. 07-02706    James M. Lammey, Jr., Judge

---

### No. W2008-01875-CCA-R3-CD  - Filed February 18, 2010

---

The defendant, Willie Hall, was convicted by a Shelby County jury of assault, a Class A misdemeanor, and was sentenced to eleven months, twenty-nine days in jail and assessed a $500 fine.  On appeal, he argues that:  (1) the trial court erred in denying his motion in limine to exclude the 911 tape; (2) the trial court gave improper jury instructions on self-defense and flight; (3) the evidence is insufficient to sustain his conviction; and (4) the trial court imposed an excessive sentence.  After review, we affirm the judgment of the trial court and remand for entry of a corrected judgment to reflect that the defendant is to serve sixty percent of his sentence.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Robert Jones, Shelby County Public Defender; Phyllis Aluko, Assistant Public Defender (on appeal); and Jennifer H. Case, Assistant Public Defender (at trial), for the appellant, Willie Hall.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lora Fowler and David Zak, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted on charges of aggravated burglary and aggravated assault arising out of his entering Polly Roberts' house and getting involved in a physical altercation with Roberts' ex-husband, Christopher Thompson,[1] on October 26, 2006. A trial was conducted April 28 through May 1, 2008.

## State's Proof

Polly Roberts testified that she had been friends with the defendant for several years, and he had done some repair work for her at her home and tanning salon business. She recalled that she was with her ex-husband, the victim, on October 26, 2006, and the two of them had just picked up groceries when the defendant called her. She said that she did not speak to the defendant because the victim grabbed the phone out of her hand and started cursing and screaming at the defendant.

Roberts testified that when they arrived home, she went upstairs to work on the payroll for her business, while the victim stayed downstairs to unload the groceries from the vehicle. Roberts said that she heard "a bang" or "commotion," so she went back downstairs. She saw blood on the landing near the bottom of the stairs, and as she entered cautiously into the kitchen, she saw the victim and the defendant fighting. She said that the defendant had his arm around the victim's neck. At some point, the victim started to reach for the defendant's eyes, and the defendant started biting him. Roberts said that she hit the defendant with "a light-weight Teflon skillet" to get him off of the victim and to stop the fight. The defendant then got up and headed out the door into the garage. The victim grabbed "two big wooden candlesticks" and went after the defendant, but Roberts got between them and the defendant walked away.

Roberts testified that she called 911 for an ambulance because the victim was "real pale" and "bleeding a lot." The victim was taken by ambulance to the hospital. She said that she did not give the defendant permission to come to her house that night.

On cross-examination, Roberts testified that in addition to the defendant doing work for her at the tanning salon, she and the defendant worked together on a project to remodel the defendant's house. She explained that she purchased and refinanced the defendant's house, and they made improvements to it. She said that the remodel was complete by October 26, 2006, but they had an arrangement whereby the defendant was supposed to make some of the mortgage payments.

---

[1] We will hereinafter refer to Thompson as the victim since he was the victim of the offense at issue in this appeal.

Roberts testified that she was the sole owner of her house at 569 Rienzi Drive where the incident occurred, and the victim's official residence was elsewhere. She said that the defendant had been to her house before and was familiar with its layout. She stated that he "[s]ometimes" used the garage door to enter and exit her home. Roberts acknowledged that, on the night of the incident, she did not see the defendant enter her house or see him hit the victim with the skillet.

The victim testified that he had been married to Roberts twice, but they were currently divorced. The victim said that he knew the defendant because Roberts had hired him to do maintenance work at the tanning salon. The victim recalled that the night of the incident, he and Roberts bought groceries, ate dinner at a restaurant, and stopped at the tanning salon to check on an employee. He said that while they were at the tanning salon, the phone rang and he recognized the defendant's voice as the caller asking to speak to Roberts. The victim stated that he hung the phone up on the defendant, and he and Roberts left the salon.

The victim testified that as they were driving home, the defendant called Roberts' cell phone five times. The victim said that he ignored several of the calls but answered three times. He recalled that each call "got progressively worse." The victim started by telling the defendant, "Stop calling, you were told to leave us alone," but the defendant called back. The victim recalled that "[t]here was profanity - from him towards me, there was words, and I exchanged words with him again - hung up again - the last one, he was just screaming profanities; and I screamed profanities back - very angry - he was furious. I was angry at this point, too[.]"

The victim testified that when they arrived home, he and Roberts carried the groceries in through the garage. He said that he shut the door from the garage into the kitchen, and Roberts went upstairs while he stayed downstairs to put the groceries away. As he was putting the groceries away, he heard a loud bang and saw that it was caused by the door from the garage into the kitchen hitting the wall. The victim recalled, "[The defendant] burst through the door and [it] slammed against the wall, and he just ran at me and grabbed me by the neck and attacked me. . . . He was just furious."

The victim testified that as he and the defendant fought, he yelled for Roberts to call the police. When Roberts came down the stairs, he and the defendant "fell into her" as they were fighting. The victim was thrown on his back on the stairs, and the defendant picked up a skillet and hit the victim in the head. The victim said that his finger was in the defendant's cheek, and the defendant bit his finger and his neck. The defendant stopped when Roberts hit him on the head with the skillet.

The victim testified that the defendant left through the garage, and the victim picked

up a big wooden candlestick and went after him. However, Roberts yelled for him to stop, and he returned to the house. The victim said that the defendant got into his car and drove away. He recalled that Roberts called the police, and he was taken by ambulance to the hospital where he stayed until 5:30 the next morning. His injuries required thirteen stitches. The victim identified photographs of his injuries and the crime scene, which were entered into evidence.

The victim stated that he and Roberts built the house on Rienzi Drive in 2000 before they divorced, then he quit-claimed it to Roberts. At the time of the incident, he had been living there with Roberts for approximately two months.

On cross-examination, the victim testified that the house on Rienzi Drive was not the residence listed on his driver's license or on the title of his truck. The victim stated that he could not recall whether the defendant was wearing anything on his head that night but said there was a hat in the house that was not there before the incident. The victim said that the defendant hit him with the skillet "multiple times."

Officer David Linville with the Memphis Police Department testified that he responded to a home invasion call at 569 Rienzi Drive on October 26, 2006. Upon arrival, Officer Linville encountered the victim, who "looked like he had been in a pretty good fight [and] was calm but disoriented." He said that the victim "was bleeding pretty good at the time." Officer Linville also spoke with Roberts who was "very nervous [and] very upset." He said that the suspect was not at the scene.

Matt Taylor, a firefighter and paramedic with the Memphis Fire Department, testified that he responded to the scene in this case. Taylor observed that the victim was "covered in a pretty good amount of blood" and had blood running down his face. Taylor said that the victim had a two-inch laceration on his forehead, a bite mark on his neck, and a deep bite on one of his fingers through to the bone. He also had abrasions and scrapes on the scalp.

### Defendant's Proof

The defendant testified that he was friends with Polly Roberts, and they also had a business relationship "flipping houses." He said that they used his "house as collateral to improve and take money out to put into other business ventures." He also did handyman work for Roberts at her tanning salon. The defendant stated that his business relationship and friendship with Roberts were still ongoing on October 26, 2006. The defendant said that he had been to Roberts' house on Rienzi Drive several times prior to the day of the incident.

The defendant testified that on October 26, 2006, he attempted to contact Roberts to

-4-

discuss the recent appraisal of the house he sold her, first by calling her at the tanning salon. He said that, when he called the salon, "[The victim] answered the phone and hung up in [his] face." The defendant said that he next tried to reach Roberts on her cell phone twice, but the victim answered each time and "yell[ed] in the phone." The defendant stated that he did not say anything to the victim during the cell phone calls, and the calls ended by the defendant hanging up because the victim "was cussing [him] out."

The defendant testified that he next tried to reach Roberts by going to her house. At the house, the defendant saw that the garage door was open and that the door from the garage into the house was "partially cracked." He stood on the steps outside the door and yelled for Roberts. The defendant said, "The door swung open, and [the victim] was standing there with a skillet, and he swung the skillet down on me." The defendant recalled that he ended up inside the house with the victim standing over him and threatening to kill him. The defendant said that he did not remember what he did after the victim threatened him, but he remembered being pushed over a magazine rack and the victim trying to claw his eyes. In response, the defendant bit the victim's finger.

The defendant testified that at some point, the victim pushed him, and they fell onto Roberts on the stairwell. When he got up, the victim "beat[]" him with the skillet until the defendant got close enough to bite the victim on the neck. The victim fell down, the defendant punched him, and the victim let go of the skillet. The defendant said that Roberts picked up the skillet and hit him, saying to let the victim go. The defendant stated that "[a]fter [Roberts] hit me with the skillet, I took the skillet and crushed the handle on it." The defendant testified that after he released the victim, the victim grabbed a candlestick and chased him out of the house. The defendant said he "left in a hurry" via the garage door. The defendant stated that he did not hit the victim with the skillet that night and only hit the victim with his fist once.

The defendant testified that he was wearing a blue Nautica hat that night. He said that as a result of the incident, the skin was torn on his hand, he had a flesh wound on his chest, and bruises on his head. The defendant testified that he had a degree in biochemistry.

On cross-examination, the defendant testified that he and Roberts only "flipped" one house and that was the house Roberts bought from him. He acknowledged that Roberts' name was the only name on the refinancing paperwork. The defendant admitted that he had not been invited to Roberts' house the night of the incident. He also admitted that he was upset because he did not think the victim should interfere in his and Roberts' business matters. The defendant acknowledged that he recognized the victim's truck parked outside Roberts' house, yet he decided to go in the garage anyway.

The defendant testified that after he left Roberts' house following the incident, he went home and called his girlfriend but did not call the police. He said that he talked to the police the next day and was told he could be facing criminal charges. He recalled that a few days later, the police came to his house to arrest him.

On redirect examination, the defendant testified that he called the police the day after the incident because his car had been towed. He said that he did not leave Memphis between the date of the incident and the date he was arrested. On recross examination, he admitted that he thought he was going to be arrested but did not turn himself in. He also elaborated that he called his girlfriend after the incident and then had a friend who was with him that night take him to his girlfriend's house.

**Rebuttal Proof**

The tape of the 911 call from the incident was played for the victim. The victim testified that he recognized Roberts' voice on the tape and his own voice in the background.

**Surrebuttal Proof**

The tape of the 911 call was played for Roberts, and she recognized her voice on the recording. She said that she told the operator that the defendant had attacked the victim and hit him with a skillet because that was what the victim had told her and she believed him. She stated that she told the operator that she wanted the defendant arrested because the victim told her to have the defendant arrested. Roberts stated that she believed the victim could hear her on the phone because they were talking back and forth and "[h]e was telling [her] what to say." She explained that she told the operator that she knew the defendant because he had done some work for her because she did not "want them to think that it was just a random someone [who] broke in [her] house," but she testified that she and the defendant were also friends.

Roberts testified that she told the operator the defendant had attacked her because "[the victim] was saying '[h]e hurt you,'" but she said the defendant was only holding her back "to keep them from falling on [her] when [they] were on the two steps." She said that she was "delirious" when she made the 911 call, and one of the causes of how she was feeling was that "[the victim] had been on cocaine."

Following the conclusion of the proof, the jury returned with a verdict of not guilty of aggravated burglary in count one and guilty of the lesser-included offense of assault in count two.

## ANALYSIS

### I. 911 Tape

The defendant argues that the trial court erred in admitting the 911 tape into evidence, arguing that the tape did not contain proper rebuttal evidence, was cumulative, contained inadmissible hearsay, and "its marginal probative value was substantially outweighed by the danger of unfair prejudice[.]"

Polly Roberts testified that she called 911 after the defendant's uninvited entry into her house and fight with the victim. The 911 tape was unavailable at the end of the State's proof, so the State rested without attempting to introduce the tape. During the presentation of his proof, the defendant testified that he had tried to call Roberts several times that night to discuss a business matter, but the victim hung up on him. Therefore, he went to Roberts' house to talk to her but was attacked by the victim after he entered Roberts' garage and stood on the stairs outside the door into the house. The defendant described fighting with the victim in an effort to defend himself from the victim's attack.

After the defendant rested his case, the State sought to introduce the tape of the 911 call as rebuttal evidence. The defendant filed a motion in limine to exclude the tape, arguing that it contained inadmissible hearsay, was cumulative, and improper rebuttal evidence. The State responded that the tape was admissible under the excited utterance exception to the hearsay rule and was being used to rebut the defendant's claim of self-defense.

The court listened to the tape and found that the statements on the tape were excited utterances and that although most of the statements on the tape "may be cumulative . . . [in that] they have been testified to[,] . . . it won't be anything so prejudicial because they've heard it already[.]" The court noted that the tape would have been admissible in the State's case-in-chief, but it also found that it was relevant in rebuttal to show, among other things, that the defendant was not welcome at Roberts' house, "that his intent was not to go over there and talk," and that the defendant and Roberts' relationship "was not such as the defendant had described it."

Rebuttal evidence is evidence that "tends to explain or controvert evidence produced by an adverse party." State v. Brown, 795 S.W.2d 689, 695 (Tenn. Crim. App. 1990) (citing Cozzolino v. State, 584 S.W.2d 765 (Tenn. 1979). The admission of rebuttal testimony lies within the discretion of the trial court and will not be reversed unless there has been a clear abuse of discretion. State v. Kendricks, 947 S.W.2d 875, 884 (Tenn. Crim. App. 1996). This court has observed that "it is within the discretion of the trial court to permit the state, in a criminal case, to introduce in rebuttal even testimony which *should* have been introduced in

chief." Id. (citation omitted).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Generally, relevant evidence is admissible and irrelevant evidence is inadmissible. Id. 402. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. 403.

Hearsay, an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible. See id. 801-802. However, excited utterances, statements relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition, are not excluded by the hearsay rule. Id. 803(2). There is a twofold rationale for admitting excited utterances:

> First, since this exception applies to statements where it is likely there was a lack of reflection--and potential fabrication--by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity. . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it.

State v. Stout, 46 S.W.3d 689, 699 (Tenn. 2001) (citations omitted), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572 (Tenn. 2004).

The first requirement, that there be a startling event or condition, is broadly construed, encompassing any event "sufficiently startling to suspend the normal, reflective thought processes of the declarant." Stout, 46 S.W.3d at 699. The second requirement, that the statement relate to the startling event or condition, is satisfied if the statement "describe[s] all or part of the event or condition, or deal[s] with the effect or impact of that event or condition." Id. "The third requirement, that the statement be made while the declarant is under the stress or excitement from the event or condition, relates most directly to the underlying rationale for the exception." Id. at 699-700.

Upon review, we cannot conclude that the trial court abused its discretion in admitting the 911 tape to rebut evidence of the defendant's intent in going to Polly Roberts' house and his claim of self-defense. The recording relayed that the defendant entered into Roberts' house, uninvited, and attacked Thompson. The victim can be heard in the background on a

few occasions, but, for the most part, it appears that Roberts is relaying events that she witnessed. The tape is to some degree cumulative in that Roberts had already testified to the events she relayed to the operator. However, the probative value of the evidence is not substantially outweighed by the "needless presentation of cumulative evidence." See Tenn. R. Evid. 403. Moreover, although it was somewhat prejudicial to the defendant for the jury to hear an excited and upset Roberts saying that she wanted the defendant arrested, such statements were not so unfairly prejudicial as to substantially outweigh the probative value of the evidence. See id.

The defendant asserts that many of the statements on the tape are hearsay and do not qualify as excited utterances because they were not made while Roberts was still acting under the stress of the startling event because the defendant had already left the scene. However, as found by the trial court and having reviewed the tape, the tape relates that Roberts was in an excited state from the startling event when she talked to the operator. Moreover, there is no requirement that the cause of the startling event still be present or that the startling event still be ongoing – only that the declarant still be under the stress or excitement from the event. We also note that many of the statements on the tape do not even qualify as hearsay as they were not offered to prove the truth of the matter asserted.

In any event, even if the trial court erred in admitting the 911 tape, any error was harmless. The admission of the tape allowed the defendant to call Roberts as a surrebuttal witness, and much of Roberts' surrebuttal testimony could be viewed as beneficial to the defense. Moreover, there was nothing on the tape so inflammatory as to have "more probably than not affected the judgment." Tenn. R. App. P. 36(b).

## II. Jury Instructions

The defendant argues that the trial court gave improper instructions to the jury on self-defense and flight. Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Erroneous jury instructions require reversal unless the error is harmless beyond a reasonable doubt. See Welch v. State, 836 S.W.2d 586, 591 (Tenn. Crim. App. 1992).

## A. Self-Defense

The defendant testified that the victim attacked him as he was standing inside the garage next to the door into Roberts' house calling out for her. His testimony indicated that his fighting with the victim was in self-defense. Thus, the defendant's testimony fairly raised the issue of self-defense, and the trial court gave a four-page instruction on self-defense to the jury.

The defendant objected to the following portion of the trial court's jury instruction on self-defense:

> Any person using force intended or likely to cause death or serious bodily injury within his or her own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

In giving this portion of the instruction, the court reasoned that if the jury rejected the defendant's claim that he was attacked by the victim first, then it should be told that the victim had the right to defend himself from the defendant's attack. The defendant argued that "the self-defense instruction should instruct the jury on how to apply that defense to [the defendant's] actions," not the victim's actions. The court found that the instruction applied to conflicting facts raised by the proof, noting that "if [the jury] [does not] believe the victim, then this . . . would not apply to the defendant; it would be harmless."

The defendant argues, and the State concedes, on appeal that it was error for the trial court to give this portion of the self-defense charge. We agree. This court has previously determined that the giving of such instruction was error under facts similar to the facts in the case at hand. See State v. Belser, 945 S.W.2d 776, 781-82 (Tenn. Crim. App. 1996). In Belser, the defendant and the victim were involved in an altercation at the victim's residence. Id. at 779. The State requested the charge on the basis that there is a presumption that one is acting in self-defense when he is attacked at his residence. Id. at 781. The court gave the requested charge, and this court concluded on appeal, "The plain language of the [self-defense] statute is that self-defense may be utilized in defense of the prosecution; it is not, however, any justification for a victim's conduct. Thus, the instruction was not warranted by the facts." Id. at 782. This is precisely the case here, and the trial court erred in giving

-10-

this portion of the self-defense instruction.

Although it was error, such error was harmless in context of the entire instruction. See Phipps, 883 S.W.2d at 142. The trial court properly charged the jury on the applicable portion of the self-defense instruction and reiterated that it was the State's burden to prove beyond a reasonable doubt that the defendant did not act in self-defense. Therefore, the instruction as a whole correctly set forth the law on self-defense. As did the court in Belser, we conclude that, in context, the instruction was not harmful to the defendant. See Belser, 945 S.W.2d at 782-83.

## B. Flight

The proof at trial established that the defendant left the scene of the incident and was arrested several days later when the police came to his home.

The trial court gave the pattern jury instruction on flight, to which the defendant objected. The defendant argued that the evidence did not show the second element of flight – a subsequent hiding out, evasion, concealment in the community, or leaving the community for parts unknown. The court based its decision to give the instruction on that it was a jury question whether there was a subsequent hiding out or evasion and, although tenuous, such could be inferred from the proof.

On appeal, the defendant argues that the evidence did not support an instruction on flight because he "did not attempt to hide out, evade arrest or to conceal himself in the community. Instead, he returned to his home, called his girlfriend and talked to the police the next day."

A flight instruction is warranted when "proof of 'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown'" has been presented at trial. State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). The State can satisfy the subsequent hiding out, evasion, or concealment requirement by introducing evidence from which a jury might infer such action. State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999) (citing Payton, 782 S.W.2d at 490; Rogers v. State, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970)). "Any contradictory evidence that serves to rebut the [S]tate's proof merely raises a question for the jury to resolve." Id. (citing Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979)).

Upon review, we first note that the evidence clearly shows a leaving of the scene of

-11-

the difficulty, but evidence of an evasion from police is somewhat tenuous. On the one hand, the evidence shows that the incident occurred on October 26 and the defendant was not arrested until November 1, from which, as held by the trial court, the jury could potentially infer evasion. On the other hand, the defendant testified that he spoke with the police the day following the incident presumably about his car being towed, was told he may be facing criminal charges, but was not told to report to the police station. However, the defendant also testified that he thought he was going to be arrested after the incident but did not turn himself in. The defendant also gave conflicting testimony concerning whether he went to his house or to his girlfriend's house following the incident.

It is our view that, while far from dispositive, there was arguably enough evidence of flight to fairly raise the issue for the jury's determination. In any event, even if it was error for the trial court to give the flight instruction, such error was harmless beyond a reasonable doubt. As noted by our supreme court in State v. Smith, 893 S.W.2d 908 (Tenn. 1994):

> Even if an instruction on flight should not have been given, any error is not reversible. The Court instructed the jury that whether the Defendant fled was a question solely for their decision, that they need not infer flight, and that flight alone was insufficient to prove guilt. This, coupled with the overwhelming proof of Defendant's guilt, renders any error as to the flight instruction harmless.

Id. at 918.

Just as in Smith, the trial court instructed the jury that whether the defendant fled was a question for its determination and that flight alone was not sufficient to find the defendant guilty. The instruction, read as a whole, and in light of the facts of this case, renders any error in giving the flight instruction harmless.

### III. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence convicting him of assault. When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim.

App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Assault is defined as the intentional, knowing, or reckless causing of bodily injury to another. Tenn. Code Ann. § 39-13-101(a)(1) (2006). In the light most favorable to the State, the evidence shows that the defendant repeatedly tried to reach Roberts on the phone and was admittedly upset at the victim's interference. The victim testified that he and the defendant screamed profanities at each other over the phone and that the defendant was furious. The defendant showed up at Roberts' house uninvited, went into the garage, entered the residence, and attacked the victim. The victim and the defendant fought, during which the victim was hit on the head with a skillet and bitten on his finger and neck.

The defendant argues that the State failed to refute the existence of self-defense beyond a reasonable doubt. A person who has reasonable fear of imminent danger of death or serious bodily injury is justified in using force in self-defense to the degree necessary to protect against the other person's use of unlawful force. See id. § 39-11-611 (2006). When the defense of self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. See id. § 39-11-201(a)(3); Belser, 945 S.W.2d at 782. However, whether a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

The defendant's argument hinges solely on the jury's accrediting his version of what transpired at Polly Roberts' house that evening – something the jury did not do. The jury was instructed on the law of self-defense, and it obviously rejected the defendant's claim that the victim was the aggressor and he was merely defending himself. The jury, instead, chose to accredit the testimony of the witnesses for the State. This was its prerogative.

## IV. Sentencing

The defendant lastly argues that the trial court imposed an excessive sentence in that the court improperly relied on general statistics and did not address all the applicable mitigating factors. Appellate review of misdemeanor sentencing is *de novo* on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. §§ 40-35-401(d), -402(d) (2006). This presumption of correctness is conditioned upon the affirmative showing that the trial court considered the relevant facts, circumstances, and sentencing principles. State v. Ashby, 823 S .W.2d 166, 169 (Tenn. 1991). The burden is on the appealing party to show that the sentence is improper. See Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Cmts.

The trial court is afforded considerable latitude in misdemeanor sentencing. See, e.g., State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). When imposing a misdemeanor sentence, the trial court is not required to conduct a sentencing hearing, but it must afford the parties a reasonable opportunity to address the length and manner of service of the sentence. Tenn. Code Ann. § 40-35-302(a). Moreover, the trial court is not required to place specific findings on the record, State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998), but must consider the principles of sentencing and the appropriate enhancement and mitigating factors in determining the percentage of the sentence to be served in actual confinement. Tenn. Code Ann. § 40-35-302(d).

At the sentencing hearing, the court heard the arguments from the parties and received the presentence report.[2] The court observed, in looking at the facts of the case, that it did not believe the defendant acted under provocation. The court reviewed the defendant's criminal record, which included, among other things, convictions for assault and aggravated criminal trespass and noted that he had recently violated an order of protection. The court concluded that because of "the number of times he's been convicted and placed on probation and the violations of probation, . . . a proper sentence is eleven months/twenty-nine days[.]"

---

[2] Although the presentence report was made an exhibit at the hearing, it was not included in the record on appeal.

In addressing whether to place the defendant on probation, the court considered the need for deterrence as evidenced by the statistics offered by the State. The court also found that other factors indicative of a need for deterrence as outlined in State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2000), militated against the grant of probation, namely that the defendant's crime was the result of intentional conduct and that the defendant had previously engaged in criminal conduct of the same type as the present offense. The court also looked at the nature and circumstances of the offense in again noting that there was no provocation – that "[the defendant] went there with the specific intent to attack [the victim] or at least confront him, and he could have stayed away. He could have just left it alone, but he didn't."

With regard to the defendant's potential for rehabilitation, the court was most concerned that the defendant had lied under oath about having a degree in biochemistry.[3] The court observed that it did not see any mitigation evidence and noted, "Frankly, I don't know if he was working or not. I don't know if I could believe anything [he] had to say in the past." Citing State v. Jenkins, 733 S.W.2d 528, 535 (Tenn. Crim. App. 1987), the court noted that it could deny probation based on untruthfulness alone. The court concluded by denying the defendant probation or split confinement and ordered that he serve his term in jail.

As stated above, the defendant argues that the trial court imposed an excessive sentence because it improperly relied on evidence of general statistics and failed to address all of the applicable mitigating factors. With regard to the statistics, the defendant argued that the relevancy was questionable in that they reflected the number of charges rather than convictions and did not show how the imposition of a particular sentence would affect the number of violent crimes. We note that the Hooper court did not establish rigorous guidelines for the use of statistics in proving a need for deterrence. Instead, the Hooper court stated:

> Use of statistics may be helpful in establishing the increasing level of the particular crime in the community, jurisdiction, or in the state. We do not require such evidence, though, and testimony by someone with special knowledge of the level of a particular crime will generally be sufficient to establish the presence of this factor.

29 S.W.3d at 11 (internal citation omitted). The statistics submitted by the State apparently

_____

[3] The defendant testified at trial that he had a degree in biochemistry, but it came out at the sentencing hearing that he did not have a degree.

showed the prevalence of charged violent offenses in the criminal courts of Shelby County,[4] which is arguably helpful in establishing the level of the crime in the community. In any event, the prevalence of the offense in the community is just one of the Hooper factors indicative of a need for deterrence, and the trial court here found two additional factors. Moreover, the need for deterrence is but one of the considerations for denying probation, and the trial court based its decision on a number of other considerations.

With regard to the mitigating factors, we note that although the court did not address all of the mitigating factors argued by the defendant one-by-one, it is apparent from the record that the court considered the factors and found none to be applicable. Moreover, we note that the application of some of the factors proffered by the defendant was contingent on accrediting the defendant's version of events. We are not persuaded that the trial court, in sentencing the defendant to eleven months, twenty-nine days and denying probation, exceeded the wide latitude of flexibility that is afforded in misdemeanor sentencing.

It is not indicated on the judgment what percentage of the sentence the defendant must serve before being eligible for consideration for work release, furlough, trusty status, and related rehabilitative programs. See Tenn. Code Ann. § 40-35-302(d). Since the trial court, at the sentencing hearing, determined that the sentence was to be served at sixty percent, we remand for entry of a corrected judgment reflecting that fact.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court and remand for entry of a corrected judgment reflecting that the defendant is to serve sixty percent of his sentence.

_____
ALAN E. GLENN, JUDGE

---

[4] We glean this information from the transcript of the sentencing hearing.