IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 16, 2019

## STATE OF TENNESSEE v. GREGORY TYRONE DOTSON

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1811     Monte Watkins, Judge**

_____

### No. M2018-00657-CCA-R3-CD

_____

The Defendant-Appellant, Gregory Tyrone Dotson, appeals from his conviction of voluntary manslaughter by a Davidson County jury. In this appeal as of right, the sole issues presented for our review are whether the evidence is sufficient to support his conviction and whether the trial court properly imposed his sentence. Upon our review, we affirm the conviction of the trial court. However, we reverse and vacate the Defendant's sentence and remand for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Affirmed in Part; Remanded for Sentencing**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Manuel B. Russ (on appeal) and Jack Byrd (at trial), Nashville, Tennessee, for the Appellant, Gregory Tyrone Dotson.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Glenn Funk, District Attorney General; and Deborah Housel and Roger D. Moore, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

This case stems from the shooting death of Antonio Kelly, the victim, by the Defendant on February 28, 2011. The Defendant does not dispute that he shot and killed the victim; however, he claims that he acted in self-defense. The following proof was adduced at the Defendant's August 29 through September 1, 2016 trial.[1]

_____

[1] The Defendant's first trial in this matter occurred on May 4 through May 6, 2015, and ended in a mistrial.

Jacques Brown, the victim's sister, testified that at the time of the offense she was the Defendant's girlfriend and that he would often stay with her at her apartment in Nashville, Tennessee. For the two-year period prior to the offense, the Defendant had attended holiday and family gatherings without incident. Brown specifically recalled that a couple of months prior to the offense, the victim and the Defendant helped her move into her apartment without any problems.

The day before the offense, Brown and the Defendant drove to her mother's apartment to return her mother's food stamp card. Brown recalled that her mother and the victim were in Kentucky playing bingo at the time, and her younger brother, Antwain Kelly, met her outside their mother's apartment to get the card. As Brown attempted to leave the area, her car was blocked-in, and two men approached the passenger side of her car to speak with the Defendant. Brown did not know the men; however, the Defendant got out of the car and spoke with them for approximately ten minutes. When the Defendant returned to the car, his mood had changed. Brown testified that she probed the Defendant about the encounter, but he did not disclose the substance of the conversation. Brown said they returned to her apartment and ate dinner.

The next morning, the day of the offense, the victim called Brown and arranged to come to her apartment to eat after he left the post office. During the phone call, Brown heard her younger brother, Antwain Kelly, in the background. Brown got off the phone, went to the kitchen, and began to warm up some left-over spaghetti. The Defendant apparently overheard her conversation and asked Brown why she invited her brothers to the apartment without letting him know. For approximately five minutes, the Defendant started "talking crazy" to Brown. Even though Brown told the Defendant that her brothers were just coming to eat, the Defendant appeared "elevated" and "furious" without an explanation as to why. Brown said the Defendant shouted, "[I]f they come up here on something, he was going to shoot one of them." At this point, the victim knocked on the apartment door. Brown looked around the corner, confirmed it was her brother coming into the apartment, and went back into the kitchen to stir the spaghetti. Brown said that the victim left the car running and that her younger brother stayed in the car listening to music.

Brown heard the Defendant ask the victim what he was doing there, to which the victim replied, "I came to see my family." She came back out of the kitchen upon hearing the victim say, "[W]ell, you didn't give me a chance to explain myself, you already pulled the gun out." When she came into the hallway, she observed the Defendant with a shotgun pointed directly at the victim. She then begged the Defendant to put the gun down, and he refused. She said the Defendant was angry and talking, but she could not understand what he was saying. She said, "[A]ll of a sudden, it got quiet and [the Defendant] shot two times."

Brown said the Defendant shot at her once. The Defendant also shot in the direction of the victim and Brown. Brown described what happened immediately after the shots as follows:

I hollered and screamed because I didn't think [the Defendant] was gonna shoot him, and then when he shot him, it scared me; and so I screamed. At that time, my brother was still standing. He didn't try to reach forward or go after it. Because I remember he shot again. That's what made me holler, like scream and holler. Because I just took off running, because I thought he was, well, I knew somebody was shot. I just seen fire come out the gun, so I was screaming and hollering, like, no, no; and I ran.

Brown ran out the front door and to the management office of her apartment complex to get help. As she was running, she slipped and fell. She also heard her younger brother, Antwain Kelly, screaming "Jacques, what happened!" She said that her body became numb, that she was in shock, and that she believed she had been shot. When she arrived at the management office, she told them to call 911. Brown said she wanted to return to her apartment to check on her brother but was unable to do so until the police arrived.

Brown recalled that on the day of the offense the victim wore an orange T-shirt, later admitted as an exhibit, and blue jeans. She described the victim as tall and skinny. She said that when she saw the victim in the hallway of the apartment, he did not have a gun. She also said that when she saw her younger brother, Antwain Kelly, outside after the shooting, he did not have a gun either. After the shooting, when Brown was in the back of a police squad car, she realized that her cell phone was in her back pocket. She received a phone call from an unfamiliar number and the caller asked, "[D]id your brother make it?" When she asked the caller's identity, the caller hung up. Brown then sent a text message to the Defendant asking why with a question mark; however, she never received a response.

Brown provided a three-hour interview detailing the circumstances of the offense to Detective Russell Thompson. Brown acknowledged that she did not initially tell Detective Thompson that she witnessed the Defendant shoot the victim. She explained that she was "going through a whole lot" and had been "traumatized" and "delusional." She did not "want to believe what had happened, seriously." Brown also testified that she had seen the gun used by the Defendant to shoot the victim a couple of weeks prior to the offense. She identified the gun at trial, later admitted as an exhibit, and said that the Defendant showed it to her. Although Brown asked the Defendant not to keep the gun at her apartment, he did so without her knowledge. Brown also explained that the

Defendant did not live with her on a permanent basis. He "stayed some nights" at her apartment and other nights he would stay at the mission.

Brown noted that the Defendant was not working at the time of the offense and paid for the gun with his monthly $700 government check. Brown also explained that she allowed the Defendant to drive her car and that he had obtained several tickets while doing so. She agreed that she had loaned the Defendant $500 to reinstate his license and drive her car without restrictions. She was unsure whether the Defendant used part of the money she loaned him to purchase the gun used to shoot the victim. Photographs showing the interior of Brown's apartment and a consent to search form from the offense date were admitted into evidence at trial. From the photographs, Brown identified bullet holes in the walls and bullet strikes on the pot of spaghetti that were not there prior to the offense.

On cross-examination, Brown acknowledged that her statements to Detective Thompson and her prior testimony contained inconsistencies. She also agreed that she met the Defendant sometime in 2009 or 2010, which was before the Defendant had been shot in the leg. She denied being aware of "difficulties" between the victim and the Defendant. However, when pressed with a prior statement, Brown agreed that she "might've" talked to her mother and brother about conflicts between the Defendant and the victim. She further acknowledged that in her statement to Detective Thompson and her prior testimony, she said she did not know whether the victim had a gun at the time of the offense.

Antwain Kelly, the victim's younger brother, testified consistently with the testimony of Brown. He agreed that the day before the offense, Brown came to his mother's apartment to drop off the food stamp card, and he met her. He confirmed that the Defendant was in the car with Brown at the time, but he did not observe anything else unusual about their visit. The day of the offense was the first time he had gone to Brown's new apartment, and he was unfamiliar with the address and the area. Upon arriving at his sister's apartment, he remained in the car to charge his phone and listen to music. He acknowledged that the victim took the car keys with him but stated that the make/model of the car enabled it to run without them. He observed the victim "tap on the window" for Brown to open the door. Although he observed the victim enter the apartment building doors, he did not see the victim enter his sister's apartment. After "a while," he heard an "echo" and observed his sister running out of the apartment. As his sister ran out of the apartment, he heard more sounds and then observed the victim come out the door "like he was trying to get away." He did not realize the victim was shot until the victim "dropped to his knees" and told him to call 911. He used the victim's phone to call 911 because his phone was in the car, and he remained with the victim until help arrived.

Antwain Kelly was asked by police if the "person" was still inside, to which he replied, "I guess so, he ain't come out the front. So maybe he went out the back." He further testified that neither he nor the victim had a gun with them on the day of the offense when they went to their sister's apartment. He signed a consent to search form for the car he and the victim drove on the day of the offense, and he acknowledged that after seeing the victim's "insides hanging out," he screamed, "I'm killing him." Antwain Kelly said that everything happened "pretty fast" and agreed that he previously said the offense lasted only "a couple of seconds." He acknowledged that he did not see the Defendant on the day of the offense, and he did not learn of the victim's death until after he provided a statement to police. On cross-examination, Antwain Kelly agreed that there were "sorta" conflicts between the Defendant and the victim, and he reasoned that "all people have issues." He clarified that he used his phone to call 911 and notified family members with the victim's phone.

Alan Jordan, a veteran officer of the Metropolitan Nashville Police Department (MNPD), testified that he responded to a shooting call regarding the instant offense. He was part of setting up and securing the crime scene, which involved securing the entry area of the doorway to the apartment complex. He did not initially observe any injured parties; however, he noticed shell casings. He also confirmed, based on a previously admitted photograph, that there was a broken window frame at the back of the apartment complex. In the same area, Officer Jordan observed nine unspent shell casings and a cartridge.

Sergeant Danny Orr of the MNPD responded to the scene in the instant case at approximately 10:45 a.m. Other officers had already secured the scene and briefed Sgt. Orr as to the circumstances. He testified, based on previously admitted photographic exhibits, that the window screen from the back of the apartment complex was collected as evidence. He said that there was no indication that the window had been broken; however, he was certain that the screen had been "pushed through." He said there were several shell casings and bullet strikes and projectiles within the interior of Brown's apartment. He identified several bullet strikes in photographs, which were also admitted as exhibits. He also identified a cooking pot with a strike mark on it, which was admitted into evidence. A "lead fragment" was also collected from the same area in the kitchen, a spent casing collected from the hallway floor, and a set of keys collected from just outside the front door of the apartment, all of which were admitted into evidence. Additionally, a projectile was collected from behind the stove in the kitchen, a copper jacket from the kitchen, and several rounds from outside the apartment were collected.

Deputy Robert Runnels of the Davidson County Sheriff's Office (DCSO) testified that at the time of the offense he was assigned to the warrants division, which involved serving civil process warrants. On the day of the offense, he heard the shooting call over

dispatch in his area and drove toward the scene with intent to help the victim or the other officers. While in route to the scene, he observed an individual, later identified as the Defendant, matching the description given for the shooter. He testified that he observed the individual walking away from the scene, wearing a white tank top, and carrying a rifle. Deputy Runnels testified that he eventually exited his car, commanded the Defendant to drop his weapon, and the Defendant complied. At the time Deputy Runnels approached the Defendant, the Defendant had a cell phone in his hand and appeared to be talking on it. Deputy Runnels testified that he had to forcibly take the phone away from the Defendant. When Deputy Runnels took the phone, he confirmed that the Defendant was talking to a 911 dispatch operator. Deputy Runnels confirmed, based on previously admitted photographs, that the Defendant had removed the magazine from the rifle and placed it under an umbrella on the ground.

Officer Darrell Osment of the MNPD testified that he responded to the shooting call in the instant case and was primarily responsible for the securing the back window to ensure no one exited the subject apartment. He stated that he also searched the wooded area in the back of the apartment complex and did not locate any shell casings. The video testimony of Special Agent Steve Scott of the Tennessee Bureau of Investigation (TBI) was offered into evidence and established that the bullet fragments collected from the crime scene and the bullet fragments removed from the victim's body matched the assault rifle recovered from the Defendant. The cartridge casings collected from the scene were also determined to have been fired from the assault rifle recovered from the Defendant. The firearms report reflecting Agent Scott's conclusions was admitted into evidence as an exhibit.

Detective Russell Thompson of the MNPD was the lead detective for the instant offense and responded to the scene around 10:40 a.m. He initially responded to Archwood Street, where the weapon had been found. He then proceeded to the apartment where the shooting occurred, was briefed on the offense, and observed Brown and Kelly in two separate patrol cars. He noted that they were kept apart to prevent them from talking with other people about the case. Detective Thompson confirmed that he interviewed Brown on the day of the offense, an hour after the victim died. He said that he interviewed Brown a second time five days after the offense and that Brown provided more information regarding the offense. Detective Thompson also interviewed Antwain Kelly on the day of the offense. Detective Thompson collected the bullet and fragments from the medical examiner's office that were recovered from the victim's body, both of which were admitted as exhibits, and submitted them to the TBI for analysis. On cross-examination, Detective Thompson confirmed that he did not know that Brown and Kelly had their cell phones with them in the patrol cars and that he did not know when they were separated at the scene.

Dr. Thomas Deering, a forensic pathologist and medical examiner, testified as an expert and performed the autopsy on the victim. Dr. Deering testified that the victim, age nineteen at the time of the autopsy, had a single gunshot wound to his abdomen on the left side. The trajectory of the bullet showed that it entered the front of the victim's abdomen, struck his backbone, broke into pieces, and "punched" a large hole in the victim's aorta. Dr. Deering recovered the bullet and the broken fragments from the victim's body, retained them for evidence, and confirmed that they were the same items previously admitted as exhibits through Detective Thompson. Dr. Deering did not observe the presence of soot, tattooing, or stippling, which meant that he could not tell the distance of the barrel of the gun from the victim's skin. He confirmed that the victim had scrapes or abrasions on both knees, which was consistent with falling. The autopsy report and the toxicology report were admitted into evidence. Dr. Deering opined that the victim's cause of death was a gunshot wound to the abdomen, and the victim's manner of death was homicide. On cross-examination, Dr. Deering agreed that he could not determine whether the bullet that entered the victim's body went through a wall.

Jacqueline Kelly, the victim's mother, testified that the last time she saw her son alive was on February 27, 2011, the day before the offense. She recounted the events of that day and explained that around 3:00 p.m., she had gone to play bingo with the victim and other family members in Kentucky. She returned home and dropped off the victim at his girlfriend's house. She identified a photograph of the victim taken a week or so before his death, which was admitted into evidence. She also testified that the Defendant had been to her home several times and that he had attended several family gatherings.

Officer Justin Pachciarz of the MNPD testified that he was one of the first officers to respond to the scene in this case. To the best of his recollection, he recalled "maybe a window being busted out and maybe some bullet holes in the wall" inside the apartment. On cross-examination, he confirmed that he had been advised that there was one shooting victim outside and possibly a second shooting victim inside the apartment.

The Defendant testified on his own behalf. According to the Defendant, the day before the offense, the Defendant and Brown, his then-girlfriend, went over to Brown's mother's house to drop off her food stamp card. In contrast to the testimony of Brown and Antwain Kelly, the Defendant said that when they arrived at Brown's mother's house, Brown handed the card to the Defendant who then handed it to Antwain Kelly. The Defendant described Antwain Kelly's demeanor in taking the card as "without speaking" and "vindictive." The Defendant said Brown sped off, turned in the cul-de-sac, and parked her car. When she did so, two men approached the car and asked to speak with him. The Defendant testified that he got out of the car because he did not want anything to happen to Brown's children, who were in the back seat. When the Defendant went to the back of the car, the two men threatened him not to "come around

- 7 -

no more" and not to be in Brown's car anymore. The Defendant said that he was a former member of the Gangster Disciples and that the men were Gangster Disciples. Although he was disturbed by the encounter, the Defendant got back in the car because he "understood the craft."

The Defendant and Brown returned to the apartment and, according to the Defendant, tensions were high. The Defendant said that he separated himself from Brown by staying in another part of the apartment. Later on that night, the Defendant said that he stepped outside to meet the mother of his son, who encouraged him to sell his rifle and leave Tennessee the next morning. The Defendant agreed that he needed to sell the rifle and took a picture of it on his cell phone. He testified that Brown gave him the money to buy the rifle from her brothers, that he kept the rifle in Brown's apartment, and that Brown knew it.

On the day of the offense, the Defendant awoke and helped Brown prepare her children for school. While Brown was gone, the Defendant intended to rest in preparation for work the next day. The Defendant said that upon Brown's return, she sat on the couch and got on the phone. The Defendant got up, went to the other bedroom, but overheard Brown's conversation with her brothers nevertheless. The Defendant then confronted Brown and asked, "[W]hy you going to put me in a situation like that, knowing me and your brothers don't get along?" The Defendant explained that he had had "difficulties" with Brown's brothers since 2009. He said that Brown's brothers were the cause of a gunshot wound to his leg, which impaired his ability to walk. He testified that he had since forgiven "this man." Following the argument between Brown and the Defendant, the Defendant heard a tap on the window.

The Defendant testified that "somebody [was] just twisting the knob [and they] came in the living room," and that he feared for his life because someone had "invaded the apartment." He grabbed the rifle, held it down, and put Brown to his side. The Defendant said that the victim came into the apartment and his body language was "aggressive" and "disrespectful." The victim went toward the kitchen and came back to the hallway, where the Defendant and Brown were standing. The Defendant said that Brown then went and stood next to the victim with her "hands on her hip, popping her mouth like, like what's up, man type situation." The Defendant had the rifle on safety and aimed at the ground not at the victim and said, "[B]rother, can we talk . . . what's the problem. I mean you just come in here like I don't know what's going on." The Defendant said the victim "present[ed] the image of having a weapon." The Defendant testified that the victim was texting the whole time and told him that it was too late to talk. The Defendant said the victim then "made a move as if he was going to do something" to him. In response, the Defendant removed the safety from the rifle and "let

off a round through the wall." The Defendant testified that it was a warning shot and that he was not intentionally trying to shoot the victim.

The Defendant testified that his "whole plan" was to escape and that he did not know where Brown's other brother, Antwain Kelly, was at the time. The Defendant said he just kept shooting through the wall until he could escape through the back window. He ran down the street and called 911. He did not put the rifle down until he saw Detective Runnel.

On cross-examination, the Defendant initially denied that he told 911 operators that the victim entered the apartment with the assault rifle, that he, the Defendant, did not shoot the rifle, and that the rifle belonged to the victim. He conceded the veracity of the statements upon hearing the 911 tape, which was played for the jury. The Defendant also agreed that the first statement he provided to Detective Thompson immediately following the offense was untrue. In pertinent part, the Defendant agreed that he initially told Detective Thompson that the day before the offense the Brown brothers were the two men who approached him and held guns on him. The Defendant agreed that he relented and told the truth of the situation only after Detective Thompson had verified that the victim had been in Kentucky playing bingo with his mother. The Defendant claimed, however, that he was truthful in the second statement. The Defendant agreed that he had a prior criminal history consisting of felony breaking and entering, larceny, theft, and attempted breaking and entering.

Detective Thompson was recalled as a witness by the State in rebuttal. Detective Thompson stated that the Defendant's first statement was about an hour. In the first statement, the Defendant maintained that the victim came into the apartment with a rifle and that the Defendant took the rifle away from the victim. It was only well into the second statement did the Defendant concede that he had the rifle all along. In contrast to much of his cross-examination testimony, the Defendant said that he was like "Rambo," that Brown was a "good woman," that he bought the gun in Antioch, and that he had fired at least one round from the hallway. Both of the Defendant's statements were audio and video recorded on DVD and admitted into evidence at trial. By the end of the second statement, Detective Thompson told the Defendant that the victim had died. Photographs of the Defendant's 2008 gunshot wound were taken during the interview and admitted into evidence.

Although the Defendant was indicted for first-degree, premeditated murder of the victim, upon hearing the above proof, the jury convicted the Defendant of voluntary manslaughter. Following a sentencing hearing, the trial court imposed a six-year sentence of confinement, to be served consecutively to another matter. The Defendant filed a motion for new trial, which was denied by the trial court on April 11, 2018. His

notice of appeal was filed on the same day, and he is now properly before this court for review.

## ANALYSIS

The Defendant does not dispute that he shot and killed the victim in this case. Instead, relying on State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994), he contends that he is entitled to relief on appeal because "the evidence of self-defense contained in the record 'raises, as a matter of law, a reasonable doubt as to [his] conduct being criminal.'" He insists that his use of force in shooting the victim was justified because he was in a place that he had a lawful right to be and he was not engaged in criminal conduct at the time. In other words, the Defendant argues that the State failed to rebut his claim of self-defense and therefore failed to establish beyond a reasonable doubt voluntary manslaughter. In response, the State contends that the proof was more than sufficient for a rational jury to reject the Defendant's claim of self-defense. We agree with the State.

Tennessee Code Annotated section 39-11-611(b) governs claims of self-defense and provides:

> (1) Notwithstanding § 39-17-1322,[2] a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> > (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> > (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

---

[2] Tennessee Code Annotated section 39-17-1322 (2014 & 2017 Supp.) provides a defense to prosecution for weapons violations under Part 13 when a person used a handgun in justifiable self-defense.

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(1)-(2). Subsection (a) allows the justification of self-defense to persons who reasonably believe they are *imminently* threatened with force or are *actually attacked* and who react with the force reasonably necessary to protect themselves. The test of "reasonable belief" places the emphasis on the defendant's reliance upon reasonable appearances rather than exposing the defendant to the peril of criminal liability where appearances were deceiving and no actual danger existed. (Advisory Comm'n Comments) (emphasis added).

When the defense of self-defense is fairly raised by the evidence, as in this case, the State carries the burden of proof to negate the defense beyond a reasonable doubt. See Tenn. Code Ann. § 39-11-201(a)(3); State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001) (citing State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)). However, the jury, as the trier of fact, determines whether the defendant acted in self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). As such, it is within the prerogative of the jury to reject a claim of self-defense. Goode, 956 S.W.2d at 527. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a); State v. Perrier, 536 S.W.3d 388, 394 (Tenn. 2017).

In this case, the Defendant specifically argues that he had a reasonable belief of imminent danger of death or bodily injury based upon his encounter with the two men the day before the victim was shot and killed, that there was no "intervening act[] that dispelled his impression" because the Brown brothers "unexpectedly" arrived the next morning, and that his belief of imminent danger of death or bodily injury was informed by his prior disagreement with the victim, who shot him in the leg. In our view, the Defendant's reliance on the prior conflict with the Brown brothers is not reasonable because it was not imminent. This conflict occurred over three years prior to the instant offense, the Defendant had attended several Brown family gatherings after the conflict without incident, and the Defendant had, in his own words, forgiven the victim. Additionally, contrary to the Defendant's initial statement to Det. Thompson, the Brown brothers were not the two men who approached the car and threatened him the day before the offense. The Defendant was also well-aware that the victim was coming to the apartment on the morning of the offense, and he became angered by it. The Defendant cannot genuinely claim that he was surprised by the victim's arrival when, during his argument with Brown, the Defendant threatened to kill her brothers.

- 11 -

We acknowledge that the Defendant testified that the victim "present[ed] the image of having a weapon" and "made a move as if he was going to do something" to him. We further acknowledge the Defendant's claim that he initially fired only a warning shot, which went through a wall and errantly struck the victim. However, the proof also established that prior to shooting the victim, the Defendant armed himself with an assault rifle, removed the safety from it, and fired multiple times into a small apartment. He fired despite Brown's pleas with him not to do so, and the victim was unarmed at the time of the shooting. Based on this evidence, the jury was entitled to reject the Defendant's claim of self-defense, as was its prerogative. Accordingly, the proof was sufficient for any jury to find that the Defendant committed the intentional or knowing killing of the victim in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. See, e.g., State v. Robinson, No. W2011-00748-CCA-R3CD, 2012 WL 1378555, at *3-5 (Tenn. Crim. App. Apr. 17, 2012) (affirming voluntary manslaughter conviction reasoning that evidence was sufficient for rational jury to have reasonably rejected defendant's claim of having acted in self-defense). The Defendant is not entitled to relief.

**Sentencing.** The Defendant also argues that the trial court abused its discretion in imposing the six-year sentence. He specifically claims that the trial court erred in imposing the maximum sentence within the range of punishment, that the trial court based its consecutive sentencing decision on improper grounds, and that the trial court failed to consider or grant "community release." In response, the State argues, and we agree, that the six-year sentence is proper. However, because the trial court failed to articulate a sufficient basis for denying alternative relief or imposition of consecutive sentencing, we remand for a new sentencing hearing.

Prior to trial, the State filed a notice of enhancement and a motion seeking consecutive sentencing. The State sought to enhance the Defendant's sentence because he had a previous history of criminal behavior in addition to those necessary to establish the appropriate range of punishment, the offense involved more than one victim, the personal injury to the victim was great, the Defendant possessed a firearm during the commission of the offense, and the Defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. §40-35-114 (1), (3), (6), (9), (10). In seeking consecutive sentencing, the State sought to establish that the Defendant was a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood; the Defendant was an offender whose record of criminal activity is extensive; and the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115 (b)(1), (2), (4).

- 12 -

At the November 4, 2016 sentencing hearing, the State introduced the presentence report into evidence without objection. The presentence report showed, in pertinent part, that the Defendant had a prior criminal history of nine misdemeanor convictions and one felony conviction for vandalism and a criminal history including breaking and entering in North Carolina. The Defendant pled guilty to the felony vandalism while he was in custody for the instant offense and received a sentence of six-years and one month incarceration. The facts supporting the felony vandalism conviction stemmed from a damaged sprinkler apparatus at the criminal justice center. The victim's mother also testified and read a letter, admitted into evidence, which reflected how the victim's death impacted her family. Following the proof, the State argued, consistently with their motions, for the maximum sentence, to be served consecutively to the felony vandalism conviction. In response, defense counsel argued for the minimum sentence. He insisted that consecutive sentencing was not appropriate because it is limited only to cases involving multiple counts and the Defendant was charged in a single count indictment.

The trial court reserved ruling on the consecutive nature of the sentence and requested additional case authority from the parties. The trial court proceeded to sentence the Defendant in all other respects and stated as follows:

> With regard to 40-35-103, the Court believes that confinement is necessary to avoid depreciating the seriousness of the offense and confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses.

> Now the Court moves to enhancement and mitigating factors. First, with respect to enhancement factors, the Court believes that there are several enhancement factors that apply. (1) That the defendant does have a previous history of criminal behavior and criminal convictions; that the defendant had no hesitation about committing a crime when the risk to human life was high, and in this case, result was death of the victim.

> The Court also believes that this involved more than one victim in this regard. More in line with what the State said is that the placed others in danger, although they were not listed in the indictment; but he did, in fact, place others in danger by discharging a weapon inside an apartment building. And any time you do that, you run the risk of seriously injuring or killing other residents in the building. So I believe that those enhancement factors apply.

> With respect to mitigating factors, the Court is not sure that acting under duress is a mitigating factor in this particular case. The Court did

- 13 -

hear testimony that Mr. Dotson believed that he was being threatened by the victim in this particular case. But all that having been said and done, the Court believes that the enhancement factors outweigh the mitigating factors.

With regard to the length of sentence, the Court believes that the appropriate sentence for taking the life of another is at the maximum range in this particular range, which would be six years.

At the next hearing on November 7, 2016, the trial court revisited the issue of consecutive sentencing. It determined that consecutive sentencing was appropriate because the Defendant had "additional sentences that [had] not been fully served" and because "a person's life was taken." The trial court additionally stated that "it was necessary to protect the public against further criminal conduct by the Defendant, and that a consecutive sentence reasonably relat[ed] to the seriousness of the offense[.]"

This court reviews a trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other alternative sentence," see State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012), and consecutive sentencing determinations, see State v. Pollard, 432 S.W.3d 851, 860-61 (Tenn. 2013). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

Additionally, before imposing sentence, a trial court is required to consider the evidence, if any, received at the trial and the sentencing hearing; the presentence report; the principles of sentencing and arguments as to sentencing alternatives; the nature and characteristics of the criminal conduct involved; evidence and information offered by the parties on the mitigating and enhancement factors set out in § 40-35-113 and 40-35-114; any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. §40-35-210(b)(1)-(7). "The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5). A court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). In determining whether to deny alternative sentencing and impose a sentence of total confinement, the trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A trial court may impose consecutive sentencing when a defendant falls into one of seven categories enumerated in Tennessee Code Annotated section 40-35-115(b), including:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual

- 15 -

acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Id. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." State v. Pollard, 432 S.W.3d 851, 862 (Tenn. 2013).

The Defendant specifically argues that the trial court misapplied enhancement factor (3), that the offense involved more than one victim, and factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high. The State concedes, and we agree, that the trial court erroneously applied enhancement factor (3), see State v. Imfield, 70 S.W.3d 698, 705-06 (Tenn. 2002). However, the misapplication of this enhancement factor does not invalidate the length of the imposed sentence because the trial court properly applied other enhancement factors including enhancement factor (1), based on the Defendant's prior criminal history, and enhancement factor (10), based on the Defendant shooting multiple times in a small apartment in the presence of Brown. Accordingly, the trial court properly imposed the maximum, six-year sentence in this case.

Next, the Defendant argues that the trial court failed to consider or grant "community release" and erred in imposing consecutive sentencing. On this issue, we agree with the Defendant. The trial court did not provide any factual findings in support of its decision to impose confinement or consecutive sentencing. As such, we are unable to conduct meaningful appellate review of this aspect of the Defendant's sentence. See State v. Trent, 533 S.W.3d at 292-96 (Tenn. 2017) (vacating the sentencing determination of the trial court and remanding for new sentencing hearing because the trial court made no findings supporting the seriousness of the offense other than restating elements of the offense). We acknowledge that at the first sentencing hearing the trial court stated that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that the Defendant had no hesitation about committing a crime in which the risk to human life was high, see Tenn. Code Ann. § 40-35-115(b)(4). However, this was done while the trial court was considering the applicable enhancement and mitigating factors. In other words, the trial court apparently conflated several sentencing considerations. Under these circumstances, we are compelled to vacate the Defendant's sentence and remand to the trial court for a new sentencing hearing limited to consideration of alternative sentencing and consecutive sentencing.

## CONCLUSION

Based on the above analysis and authority, we affirm the Defendant's conviction of voluntary manslaughter. We reverse and vacate the Defendant's sentence, however, and remand for a new sentencing hearing limited to consideration of alternative sentencing and consecutive sentencing.

_____
CAMILLE R. MCMULLEN, JUDGE